UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF IMPERIAL BEACH, a municipal corporation, SAN DIEGO UNIFIED PORT DISTRICT, a public corporation, and CITY OF CHULA VISTA, a municipal corporation,<br><br>                    Plaintiffs,<br><br>v.<br><br>THE INTERNATIONAL BOUNDARY & WATER COMMISSION-UNITED STATES SECTION, an agency of the United States, and VEOLIA WATER NORTH AMERICA - WEST, LLC,<br><br>                    Defendants. | Case No.:  18cv457 JM (JMA)<br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS** |

On June 12, 2018, Defendants The International Boundary & Water Commission – United States Section ("USIBWC") and Veolia Water North America – West, LLC ("Veolia") (collectively, "Defendants") filed separate motions to dismiss.  (Doc. Nos. 15, 17.)  Plaintiffs the City of Imperial Beach, San Diego Unified Port District, and the City of Chula Vista (collectively, "Plaintiffs") oppose the motions.   (Doc. No. 20.)   Having carefully considered the matters presented, the court record, and the arguments of counsel, the court denies Veolia's motion to dismiss for lack of standing, denies Defendants'

motions to dismiss Plaintiffs' first and second causes of action, and grants Defendants' motions to dismiss Plaintiffs' third cause of action with leave to amend.

## BACKGROUND[1]

### I. The Parties

#### A. Plaintiffs

The City of Imperial Beach is a California General Law City and municipal corporation, duty organized and existing by virtue of the laws of the State of California. The San Diego Unified Port District is a public entity created by the San Diego Unified Port District Act, California Harbors & Navigation Code, Appendix 1, § 1 et seq. The City of Chula Vista is a California Charter City and municipal corporation, duly organized and existing under the laws of the State of California and the Charter of the City of Chula Vista.

#### B. Defendants

The USIBWC is an agency and instrumentality of the United States government charged with addressing transboundary issues arising out of agreements between the United States and Mexico, including the Treaty of February 3, 1944, for the Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande ("1944 Treaty"). Veolia is a limited liability company incorporated in Delaware and headquartered in Massachusetts. Veolia contracts with USIBWC to operate and maintain the South Bay International Wastewater Treatment Plant ("South Bay Plant") and its associated facilities.

### II. The International Boundary and Water Commission

The International Boundary and Water Commission ("Commission") is a bi-national body comprised of USIBWC and the Comisión Internacional de Límites y Aguas ("CILA") in Mexico. Both sections of the Commission exercise the rights and obligations of their governments under the 1944 Treaty. Under the 1944 Treaty,

> Neither Section [USIBWC or CILA] shall assume jurisdiction or control over works located within the limits of the country of the other without the

---

[1] The facts in this section are drawn from the relevant complaints and submissions from the parties, and, at this stage, are taken as true to the extent they are well pleaded.

2

express consent of the Government of the latter. The works constructed, acquired or used in fulfillment of the provisions of this Treaty and located wholly within the territorial limits of either country, although these works may be international in character, shall remain, except as herein otherwise specifically provided, under the exclusive jurisdiction and control of the Section of the Commission in whose country the works may be situated. (Doc. No. 16-1 ("1944 Treaty") Art. 2.)[2]

## III. South Bay Plant

Decisions of the Commission are recorded in Minutes. In 1990, the Commission entered into an agreement known as Minute 283 to address the border sanitation problem in San Diego, California, and Tijuana, Baja California. (Doc. No. 16-2 ("Minute 283").) Among other things, Minute 283 led to the construction of the South Bay Plant.

The South Bay Plant is located in the Tijuana River Valley in the City of San Diego, San Diego County, California. The South Bay Plant was designed to handle 25 million gallons per day, based on a 30-day average, "to treat sewage generated in excess of the

---

[2] In general, the court may not consider material other than the facts alleged in the complaint when deciding a motion to dismiss. Anderson v. Angelone, 86 F.3d 932, 934 (9th Cir. 1996) ("A motion to dismiss . . . must be treated as a motion for summary judgment . . . if either party . . . submits materials outside the pleadings in support or opposition to the motion, and if the district court relies on those materials."). However, "[t]here are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." Khoja v. Orexigen Therapeutics, Inc., 2018 WL 3826298, at *6 (9th Cir. Aug. 13, 2018). Federal Rule of Evidence 201 provides that courts may take judicial notice of facts that are not subject to reasonable dispute because they are generally known or are capable of accurate and ready determination. See Fed. R. Evid. 201(b). The court may take notice of such facts on its own, and "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c). Accordingly, a court "may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

USIBWC requests the court take judicial notice of the 1944 Treaty, Treaty Minute 283, and a particular report of the House of Representatives. (Doc. No. 16.) These items are appropriate for judicial notice because they are matters of public record. The parties do not dispute their authenticity and the documents do not contain disputed facts. Accordingly, the court grants USIBWC's request for judicial notice.

capacity" of facilities in Mexico.  (Minute 283 at 4.)  USIBWC owns the South Bay Plant and Veolia operates it.  The South Bay Plant and its associated facilities are subject to the terms of National Pollution and Discharge Elimination System ("NPDES") permit CA0108929 (the "NPDES Permit").  The NPDES Permit authorizes discharges of pollutants at the South Bay Ocean Outfall only, and only after such pollutants have gone through secondary treatment at the South Bay Plant.  All other discharges are prohibited.

The primary influent to the South Bay Plant is sewage from Mexico.  (Doc. No. 13 ("FAC") ¶ 58.)  While a CILA Diversion exists in Mexico to divert flows in the Mexican Tijuana River into the transboundary sewage system, it "frequently malfunctions, allowing sewage to flow past the Diversion and across the U.S./Mexico Border."  (FAC ¶ 59.)

## A.    Canyon Collectors

Water that crosses the border into the United States from Mexico west of the flood control conveyance does so at six discernible locations: Yogurt Canyon, Goat Canyon, Smuggler's Gulch, Canyon Del Sol, Silva Drain, and Stewart's Drain.  USIBWC owns and Veolia operates canyon collectors at all locations except for Yogurt Canyon.

The canyon collectors are among the facilities that operate under and are subject to the South Bay Plant NPDES Permit.  They are "designed to capture and detain polluted wastewater the moment it crosses the U.S./Mexico Border into the United States."  (FAC ¶ 65.)  Each concrete collector abuts the border and spans the opening of one of the drainage points.  The canyon collectors collect and direct wastewater into a shallow detention basin.  Wastewater in the detention basin is then directed to a screened drain inlet ("collector inlet") regulated by a valve.  When open, the water in the detention basin is accepted into a pipe system and conveyed to the South Bay Plant for treatment and eventual discharge at the South Bay Ocean Outfall.  When closed, the water cannot drain into the treatment system, and instead overflows the detention basin and travels into the downstream drainages.

According to Plaintiffs, the downstream waters that receive canyon collector overflow are either "navigable" in the traditional sense or are tributaries to the New Tijuana

River or the Historical Tijuana River, and ultimately the Tijuana River Estuary and the Pacific Ocean. The pollutants and hazardous wastes "from Mexican waters," (FAC ¶ 75), "substantially impact downstream water quality," (FAC ¶ 66).

## IV. Flood Control Conveyance

In 1978, USIBWC constructed a flood control conveyance designed to capture as much as 135,000 cubic feet of water per second from the Tijuana River as it crosses the border from Mexico into the United States. (FAC ¶ 43.) The flood control conveyance is a discrete, concrete-lined conveyance with banked sides that begins at the United States border with Mexico. It directs water, sewage, and other wastes into an area of the Tijuana River Valley west of the historical course of the Tijuana River, in which the Tijuana River had not previously flowed. In doing so, Plaintiffs allege that USIBWC "significantly upended the natural hydrology of the Tijuana River Valley." (Id.) At the terminus of the flood control conveyance, its contents are released into a largely undeveloped area of the Tijuana River Valley. According to Plaintiffs, "[t]hese discharges have carved a new river channel, the New Tijuana River, downstream of the USIBWC Flood Control Conveyance." (Id. ¶ 45.) The New Tijuana River flows into the "Historical Tijuana River" approximately one mile downstream of the flood control conveyance's terminus.

The flood control conveyance is not subject to the NPDES Permit, and Veolia is not involved in its operation. Plaintiffs allege that USIBWC routinely and frequently discharges a substantial portion, if not all, of the pollutants and solid and/or hazardous wastes that it captures from the Mexican portion of the Tijuana River and conveys through the flood control conveyance.

USIBWC recently constructed a temporary earthen berm at the border between the United States and Mexico to reduce the volume of flow into the flood control conveyance from the Tijuana River in Mexico, redirecting those flows south into the CILA Diversion. However, Plaintiffs note that the berm is not designed to protect against high volume flows and may wash out with even the slightest amount of precipitation. (FAC ¶ 62.)

///

## V.    Procedural Background

On September 27, 2017, Plaintiffs notified Defendants of their intent to sue over Tijuana Valley pollution discharges, as required under the Clean Water Act ("CWA"). 33 U.S.C. § 1365(b).  On March 2, 2018, Plaintiffs initiated this action against Defendants. (Doc. No. 1.)  The operative First Amended Complaint ("FAC") alleges three causes of action: (1) against USIBWC, discharges of pollutants from the flood control conveyance without a NPDES permit in violation of the CWA, 33 U.S.C. §§ 1311(a), 1342; (2) against both Defendants, discharges of pollutants from the canyon collectors in violation of the CWA and the NPDES Permit; and (3) against both Defendants, contribution to an imminent and substantial endangerment in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B).  (Doc. No. 13.)

On June 12, 2018, USIBWC moved to dismiss the FAC for failure to state a claim. (Doc. No. 15.)  That same day, Veolia moved to dismiss the FAC for failure to state a claim and for lack of standing.  (Doc. No. 17.)  The court permitted Plaintiffs to file a single opposition brief addressing both motions.

## LEGAL STANDARDS

## I.    Rule 12(b)(1) – Lack of Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction.  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998).  As the party putting the claims before the court, Plaintiffs bear the burden of establishing jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

There is no subject matter jurisdiction without standing, and the "irreducible constitutional minimum" of standing consists of three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  A plaintiff must have (1) suffered an injury in fact, (2) which is fairly traceable to the challenged conduct of the defendant, and (3) which is

likely to be redressed by a favorable judicial decision.  <u>Id.</u> at 560–61.

A party may make either a facial or factual attack on subject matter jurisdiction.  <u>See, e.g.</u>, <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir. 2003).   In resolving a facial challenge, the court considers whether "the allegations contained in [the] complaint are insufficient on their face to invoke federal jurisdiction."  <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004).   The court must accept the allegations as true and must draw all reasonable inferences in the plaintiff's favor.  <u>Wolfe v. Strankman</u>, 392 F.3d 358 (9th Cir. 2004).   In resolving a factual challenge, the court may consider evidence outside the complaint and ordinarily "need not presume the truthfulness of the plaintiff's allegations."  <u>Safe Air for Everyone</u>, 373 F.3d at 1039.   "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  <u>Id.</u>   At the motion to dismiss stage, standing is demonstrated by allegations of "specific facts plausibly explaining" why the requirements are met.  <u>Barnum Timber Co. v. EPA</u>, 633 F.3d 894, 899 (9th Cir. 2011).

## II.      Rule 12(b)(6) – Failure to State a Claim

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the pleadings.   To overcome such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).   Facts merely consistent with a defendant's liability are insufficient to survive a motion to dismiss because they establish only that the allegations are possible rather than plausible.  <u>Id.</u> at 678–79.   The court must accept as true the facts alleged in a well-pleaded complaint, but mere legal conclusions are not entitled to an assumption of truth.  <u>Id.</u>   The court must construe the pleading in the light most favorable to the non-moving party.

Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995).

# DISCUSSION

## I.    Standing

Veolia challenges Plaintiffs' Article III standing to sue it.  To establish standing, and thus the court's subject matter jurisdiction, a plaintiff must have (1) suffered an injury in fact, (2) which is fairly traceable to the challenged conduct of the defendant, and (3) which is likely to be redressed by a favorable judicial decision.  Lujan, 504 U.S. at 560–61.  At issue are the last two elements.

### A.    Traceability

The traceability element of Article III standing requires a causal connection between the injury and the complained of conduct.  Accordingly, Plaintiffs must show that the injury is fairly traceable to Veolia's alleged misconduct, and not the result of misconduct of some third party not before the court.  See Lujan, 504 U.S. at 560–61.  Standing does not require the defendant's action to be the sole source of injury.  Washington Envtl. Council v. Bellon, 732 F.3d 1131, 1142 (9th Cir. 2013).  In sum, "[t]he causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits."  Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1152 (9th Cir. 2000).

Here, Veolia argues that the allegations in the FAC fail to demonstrate how Veolia did anything to cause the problem of cross-border pollution when its operation of USIBWC's wastewater treatment facilities does not produce, add to, or exacerbate the pollution that originates in Mexico.  (Doc. No. 17-1 at 11.)  In the FAC, Plaintiffs allege that Veolia has contracted to operate and maintain the South Bay Plant and its associated facilities.  (FAC ¶ 57.)  Those facilities include the five canyon collectors.  (FAC ¶ 63.)  When the collector inlets are closed, which is controlled by USIBWC and Veolia, or the volume of flow exceeds the detention basin's capacity, water in the detention basin cannot travel to the treatment system, and instead overflows into the downstream drainages.  (FAC

8

¶ 65.)  According to Plaintiffs, Veolia

> controls whether additional measures are implemented to contain high-volume flows in the canyon collectors, such as by placing sandbags to increase their detention capacity; whether overflow is halted, such as by cleaning debris from a collector inlet or turning off a pump or closing a valve; and whether canyon collector discharges are contained in a localized area and cleaned up.  Veolia has failed to contain and clean up such discharges as required by the NPDES Permit, thereby causing the presence of pollutants and/or solid and hazardous wastes in the Tijuana River Valley.

(FAC ¶ 79.)

Under the NPDES Permit, the "Discharger" is required to prepare and submit a Spill and Transboundary Wastewater Flow Prevention and Response Plan ("Prevention/Response Plan").  (Doc. No. 15-2 ("NPDES Permit") at 16.)[3]  The Prevention/Response Plan is required to incorporate procedures for containment of spills or transboundary wastewater flows, as well as procedures for cleaning up such spills and flows.  (NPDES Permit at 20.)

Although Veolia is not the source of the pollution, the NPDES Permit under which it operates does require Veolia to work to contain and clean up wastewater that comes into

---

[3] On a motion to dismiss, the court may also consider documents apart from the pleadings based on the incorporation-by-reference doctrine.  Incorporation by reference "is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  Khoja, 2018 WL 3826298, at *9.  Under this doctrine, the court may consider extrinsic documents when "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document."  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).  Here, Plaintiffs' second cause of action alleges discharges in violation of the NPDES Permit for the South Bay Plant.  (FAC ¶¶ 107–16.)  Determining whether USIBWC and Veolia have violated the terms of the NPDES Permit requires the court to examine the contents of the NPDES Permit.  Defendants each attached a copy of the NPDES Permit to their respective motions to dismiss, and no party disputes its authenticity.  Therefore, the court may consider the contents of the NPDES Permit without converting the motions into motions for summary judgment under the incorporation-by-reference doctrine.

the canyon collectors from Mexico. Failure to do so, as Plaintiffs allege, contributes to the amount of wastewater that makes its way into the Tijuana River Valley and, eventually, the Pacific Ocean. Therefore, Plaintiffs have sufficiently alleged traceability at this stage of proceedings. See Washington Envtl. Council v. Bellon, 732 F.3d at 1142 ("Nor does standing require the defendant's action to be the sole source of injury.").

## B.    Redressability

To satisfy the final element of Article III standing, it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 561 (internal citation omitted). Redressability "analyzes the connection between the alleged injury and requested judicial relief." Washington Envtl. Council v. Bellon, 732 F.3d at 1146. "Redressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable judicial decision." Id. This element is not met when redress "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." Asarco Inc. v. Kadish, 490 U.S. 605, 615 (1989). "A plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard." Nat. Res. Def. Council v. Sw. Marine, Inc., 236 F.3d 985, 995 (9th Cir. 2000).

Veolia argues that because the "primary causes of the alleged discharges are inadequate facilities in the United States and problems with Mexican wastewater facilities, [ ] nothing short of the United States and Mexican governments funding and building new infrastructure and upgrading existing infrastructure will eliminate the pollution problem." (Doc. No. 17-1 at 12.) As a contract operator, Veolia has no duty to fund or build new or upgraded infrastructure. Furthermore, the necessary funds would require approval by Congress, an independent actor not before the court that exercises broad discretion regarding the appropriation of funds.

Plaintiffs argue that Veolia's argument conflates control over what flows into the

canyon collectors with control over what happens to the waters after they are collected and detained by the system. The FAC alleges that Veolia's failure to remove debris and contain or clean up wastewater overflow pursuant to the Prevention/Response Plan contributes to the amount of pollution in the Tijuana River Valley. (FAC ¶ 79.)

Veolia's alleged failure to contain and clean up wastewater according to the Prevention/Response Plan constitutes a continuing violation of the NPDES Permit. Plaintiffs seek injunctive relief and civil penalties.

Thus, although any relief the court would grant Plaintiffs with respect to their claims against Veolia would not end the flow of polluted water from Mexico into the United States, it would mitigate injury to Plaintiffs by reducing the quantity of wastewater that ends up in the Tijuana River Valley and Pacific Ocean. Accordingly, Plaintiffs have demonstrated that they have Article III standing to sue Veolia under the CWA and RCRA. Therefore, the court denies Veolia's motion to dismiss for lack of standing.

## II. Flood Control Conveyance

Plaintiffs' first cause of action is against USIBWC for discharge of pollutants from the flood control conveyance without a NPDES permit in violation of the CWA. (FAC ¶¶ 95–106.)

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the "discharge of any pollutants." CWA § 301(a), 33 U.S.C. § 1311(a). Under the CWA, a "discharge of pollutants" is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Navigable waters" are "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). A point source "need not be the original source of the pollutant; it need only convey the pollutant" to waters of the United States. <u>S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians</u>, 541 U.S. 95, 105 (2004).

Thus, to establish a violation of the CWA, Plaintiffs must adequately allege that USIBWC (1) discharged (2) a pollutant (3) to navigable waters (4) from a point source. In dispute is whether the flow of polluted water through and out of the flood control conveyance qualifies as a discharge under the CWA.

## A. Whether the Waters Are Meaningfully Distinct

USIBWC argues that the movement of water through the flood control conveyance into the river is a conveyance within a single waterway, and thus not a discharge.

The Supreme Court held in Miccosukee that the transfer of polluted water between "two parts of the same water body," i.e., water bodies that are not meaningfully distinct, does not constitute a discharge of pollutants under the CWA because nothing is being added. Miccosukee, 541 U.S. at 109. "[I]f one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot." Id. at 110 (quoting Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 492 (2d Cir. 2001), adhered to on reconsideration, 451 F.3d 77 (2d Cir. 2006)).

The same concept applies when an improved portion of a navigable waterway flows into an unimproved portion of the same waterway. In Los Angeles Cty. Flood Control Dist. v. Nat. Res. Def. Council, Inc., 568 U.S. 78 (2013), the Los Angeles County Flood Control District ("District") operated a municipal separate storm sewer system , a drainage system that collected, transported, and discharged storm water. The District obtained a NPDES permit to discharge the storm water, which was often heavily polluted, into navigable waters. Id. at 80–81. Monitoring stations for the Los Angeles and San Gabriel Rivers, located in concrete channels constructed for flood-control purposes, regularly detected polluted water. Accordingly, the defendants brought suit under the CWA, alleging the water-quality measurements from those monitoring stations demonstrated the District was violating the terms of its permit. Id. at 81. The Ninth Circuit held "that a discharge of pollutants occurred under the CWA when the polluted water detected at the monitoring stations 'flowed out of the concrete channels' and entered downstream portions of the

waterways lacking concrete linings. Because the District exercises control over the concrete-lined portions of the rivers, the Court of Appeals held, the District is liable for the discharges that, in the appellate court's view, occur when water exits those concrete channels." Id. at 82 (internal citation omitted). The Supreme Court reversed because the improved and unimproved portions were not meaningfully distinct waterways. Accordingly, the Supreme Court held "the flow of water from an improved portion of a navigable waterway into an unimproved portion of the very same waterway does not qualify as a discharge of pollutants under the CWA." Id. at 83.

First, USIBWC argues that the "New Tijuana River" does not exist outside of the FAC, and instead there is only one Tijuana River, not two distinct water bodies. The New Tijuana River is not referenced in the notice of intent to sue letter ("NOI") nor the original complaint filed by Plaintiffs. However, Plaintiffs allege in the FAC that there is no natural or historical hydrological connection between the New Tijuana River and the Tijuana River. But for the flood control conveyance, the New Tijuana River would not exist. Because the court accepts as true all well-pleaded facts and construes the pleadings in the light most favorable to the nonmoving party on a motion to dismiss, the court accepts the existence of the New Tijuana River as a separate water body at this stage.

Second, USIBWC argues that there is no meaningful distinction between the New Tijuana River and the Tijuana River. "Because the Tijuana River both created, and is the sole source of, the 'New Tijuana River,' the waters of the former and the latter are in every sense the same." (Doc. No. 22 at 3.) While this argument is logical and somewhat compelling, the border complicates matters. Plaintiffs argue because the polluted water in the flood control conveyance comes from a body of water in Mexico, it introduces pollutants into the waters of the United States for the first time, thereby adding pollutants in violation of the CWA. The parties could not identify any case, and the court is aware of none, in which a court addressed a CWA claim in which polluted water enters the United States from another country.

/ / /

13

To deal with this issue, USIBWC argues the flood control conveyance itself is a water of the United States, and thus movement of water between it and the New Tijuana River is the flow of water between the same domestic waterway. This line of argument focuses solely on waters in the United States. USIBWC argues the flood control conveyance is a tributary of the New Tijuana River, Historical Tijuana River, Tijuana River Estuary, and Pacific Ocean. See Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526, 533 (9th Cir. 2001) ("A stream which contributes its flow to a larger stream or other body of water is a tributary.") (internal citation and quotation omitted). In Headwaters, the Ninth Circuit determined that irrigation canals were waters of the United States because they were tributaries to the streams with which they exchanged water. Id.

Notably, the cases cited by the parties were decided within the context of summary judgment, where either the factual record had been developed through discovery, Los Angeles Cty. Flood Control Dist., 568 U.S. 78, or the case recognized the need for future development of the record, Miccosukee, 541 U.S. at 99 ("we vacate and remand for further development of the factual record"). The court finds that the factual determination of whether the flood control conveyance and the New Tijuana River are meaningfully distinct, which would include determining whether the flood control conveyance is a tributary under the Clean Water Act, cannot be made based on the record currently before the court.

### B. Water Transfer Rule

Even if the New Tijuana River is meaningfully distinct from the Tijuana River, USIBWC argues that no NPDES permit is required under the Water Transfer Rule.

Certain discharges do not require a NPDES permit, such as discharges from a water transfer. 40 C.F.R. § 122.3(i). This exception is called the Water Transfer Rule. "Water transfer means an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use. This exclusion does not apply to pollutants introduced by the water transfer activity itself to the water being transferred." Id. (emphasis added). However, as above, the portion of the Tijuana River in Mexico complicates the application of the Water Transfer Rule here.

Plaintiffs argue that because the flood control conveyance adds pollutants from waters of Mexico into waters of the United States, the Water Transfer Rule does not apply. In response, USIBWC reiterates its argument that the flood control conveyance is a tributary, and thus a water of the United States itself. As a result, USIBWC argues, the Water Transfer Rule would have to apply if the flood control conveyance and the New Tijuana River were meaningfully distinct.

At this stage of the proceedings, the factual record has not been developed to allow the court to rule on whether the flood control conveyance and New Tijuana River are meaningfully distinct or whether the flood control conveyance is a tributary. Accordingly, the court denies USIBWC's motion to dismiss Plaintiffs' first cause of action.

## III. Canyon Collectors

Plaintiffs' second cause of action, against both Defendants, alleges Defendants discharge pollutants from the canyon collectors in violation of the CWA and the NPDES Permit for the South Bay Plant. (FAC ¶¶ 107–16.) Defendants argue the water that flows past the canyon collectors are not discharges under the CWA or the NPDES Permit.

Despite the general prohibition on the discharge of pollutants, the CWA also establishes a permit system that authorizes the discharge of some pollutants—the NPDES. 33 U.S.C. § 1342. Under the NPDES, the Environmental Protection Agency and approved states may issue permits for the discharge of pollutants that meet certain requirements. NPDES permits "place limits on the type and quantity of pollutants that can be released into the Nation's waters." Miccosukee, 541 U.S. at 102. The NPDES Permit applies to discharges from the South Bay Plant and its facilities, which include the five canyon collectors.

### A. Discharges Under the CWA Generally

As Plaintiffs allege in the FAC, when the collector inlets of the canyon collectors are closed, "water in the detention basin cannot drain into the conveyance and treatment system, and instead overflows the detention basin and discharges into the downstream drainages." (FAC ¶ 65.) "The downstream waters that receive canyon collector discharges

are either 'navigable' in the traditional sense of the word or are tributaries to the New Tijuana River or the Historical Tijuana River, and ultimately the Estuary and the Pacific Ocean." (FAC ¶ 66.)

Defendants argue that the movement of water described in the FAC is not a discharge that requires a NPDES permit or violates the CWA because the canyon collectors are tributaries that flow into natural drainages. See Los Angeles Cty. Flood Control Dist., 568 U.S. at 83 ("the flow of water from an improved portion of a navigable waterway into an unimproved portion of the very same waterway does not qualify as a discharge of pollutants under the CWA."). However, as discussed above, making such a determination is a factual question not appropriate for determination on a motion to dismiss.

## B.   Discharges Under the NPDES Permit for the South Bay Plant

Defendants also argue that Plaintiffs' second cause of action fails because the movement of water in the canyon collectors that is not collected for treatment does not violate the terms of the NPDES Permit.

"Although the NPDES permitting scheme can be complex, a court's task in interpreting and enforcing an NPDES permit is not—NPDES permits are treated like any other contract." Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles, 725 F.3d 1194, 1204 (9th Cir. 2013). The court must read the NPDES Permit as a whole and "give effect to every word or term employed by the parties and reject none as meaningless or surplusage." In re Crystal Properties, Ltd., L.P., 268 F.3d 743, 748 (9th Cir. 2001).

The NPDES Permit prohibits the discharge of waste to any location other than the South Bay Ocean Outfall. (NPDES Permit at 4.) Transboundary flows are defined as "[w]astewater and other flows that cross the international border from Mexico into the United States." (NPDES Permit at A-10.) The NPDES Permit does not address transboundary flows during wet weather events. For dry weather transboundary flows, the NPDES Permit recognizes different categories. A Facilities Spill Event is a "discharge of treated or untreated wastewater or other material to the environment that occurs from the Discharger's Facilities, including . . . the five canyon collector systems." (NPDES Permit

16

at 15 (emphasis added).)  A Flow Event Type A is a "dry weather transboundary treated or untreated wastewater or other <u>flow</u> through a conveyance structure . . . and not diverted into the canyon collector system for treatment at the" South Bay Plant.  (<u>Id.</u> (emphasis added).)

Defendants argue the wastewater that flows past the canyon collectors when the collector exceeds capacity is a Flow Event Type A.  Because the permit's definition for a Flow Event Type A does not contain the word "discharge," whereas a Facilities Spill Event does, Defendants argue it does not qualify as a discharge under the NPDES Permit.  However, the permit states that its prohibition on discharges of waste to any location other than the South Bay Ocean Outfall "applies to any dry weather <u>discharge</u> of waste <u>overflowing</u> the canyon collectors," which Plaintiffs argue includes Flow Events Type A.  (NPDES Permit at F-36 (emphasis added).)   Both Veolia and USIBWC argue that Plaintiffs' interpretation of the NPDES Permit at F-36 would swallow the distinction between a Facilities Spill Event and a Flow Event Type A.  USIBWC would have the court read the phrase "any dry weather discharge of waste overflowing the canyon collectors" to mean a Facilities Spill Event only.

At oral argument, the court directed the parties' attention to another section of the NPDES Permit that references Facilities Spill Events, Flow Events Type A, and discharges.  Page 26 of the NPDES Permit contains a list of notification and reporting requirements.  It states that "Facilities Spill Events and Flow Events Types A and B . . . shall be categorized for notification and reporting purposes" into six different categories.  (NPDES Permit at 26.)  The description of each of those six categories uses the term "discharge" to describe the movement of water.  Because this list is for both Facilities Spill Events and Flow Events Type A, it suggests that both events are discharges.  The distinction between the two events then would depend on where the wastewater is located in the treatment system.  A Facilities Spill Event includes wastewater that has been diverted into the canyon collector system, whereas a Flow Event Type A is "not diverted into the canyon collector system for treatment."  (NPDES Permit at 15.)  Although USIBWC argues that the use of "discharge"

in this section of the NPDES Permit is in a generic sense, there is no evidence within the permit that "discharge" is used generically in some sections but specifically in others. Consequently, it appears from the NPDES Permit that a Flow Event Type A can be a discharge that violates the terms of the permit.

Based on the court's reading of the NPDES Permit, Plaintiffs adequately allege in the FAC that Defendants discharge water from a location other than the South Bay Ocean Outfall, thereby violating the terms of the NPDES Permit. Accordingly, the court denies Defendants' motions to dismiss Plaintiffs' second cause of action.

**IV. RCRA Claim**

Plaintiffs' third cause of action, asserted against both Defendants, is for violation of the RCRA. (FAC ¶¶ 117–26.)

The RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996). Its primary purpose is "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Id. (quoting 42 U.S.C. § 6902(b)). The RCRA permits citizen suits against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

The Ninth Circuit has held that "contribution" requires "that a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA." Hinds Investments, L.P. v. Angioli, 654 F.3d 846, 851 (9th Cir. 2011). "Handling the waste, storing it, treating it, transporting it, and disposing of it are all active functions with a direct connection to the waste itself." Id. While the parties, in their papers and at oral argument, discussed causation separately from contribution, the court views causation as a part of the contribution element. See California Dep't of Toxic Substances

Control v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d 930, 979 (E.D. Cal. 2003) ("To be liable under RCRA, [a defendant's] 'contribution' must be causally connected to the possibility of an 'imminent and substantial endangerment.'"). Accordingly, the court will address contribution and causation together.

## A. Mexico's Wastewater Collection and Treatment System

Plaintiffs allege that USIBWC has violated the RCRA because it "has contributed and continues to contribute to the design, construction, operation, maintenance, and monitoring of the transnational wastewater collection and treatment system that originates in Mexico . . . causing sewage and other solid and/or hazardous waste to enter the United States and discharge from the USIBWC Flood Control Conveyance." (FAC ¶ 121 (emphasis added).)

USIBWC argues that it cannot be held liable under the RCRA for the state of water treatment systems in Mexico because it is not actively involved in and does not have any degree of control over those systems. Under the 1944 Treaty, "[n]either Section [USIBWC or CILA] shall assume jurisdiction or control over works located within the limits of the country of the other without the express consent of the Government of the latter." (1944 Treaty Art. 2.) Plaintiffs do not allege in the FAC that Mexico has granted USIBWC control over the treatment plant in Tijuana. Under Minute 283, the operation and maintenance of the treatment plant in Tijuana "shall be charged to Mexico," not USIBWC. (Minute 283 at 5 ¶ 3.)

Plaintiffs did not contest or otherwise address this argument in their opposition brief or at oral argument. Therefore, the court grants USIBWC's motion to dismiss Plaintiffs' third cause of action as it relates to any treatment systems in Mexico.

## B. Flood Control Conveyance, Canyon Collectors, and Other Infrastructure

Plaintiffs allege that Defendants "have systematically and routinely contributed to the past and/or present handling, storage, treatment, transport, and/or disposal of hazardous and/or solid wastes in the Tijuana River Valley . . . through operating, maintaining, and/or controlling the USIBWC Flood Control Conveyance, canyon collectors, and other

infrastructure." (FAC ¶ 120.) Defendants argue that they do not contribute to the pollution within the meaning of the RCRA because the polluted waters originate in Mexico and flow into the United States by gravity, unaided by USIBWC or Veolia.

### 1. Flood Control Conveyance

Plaintiffs argue that USIBWC handles waste in the flood control conveyance by actively capturing polluted water from the Tijuana River in Mexico and transporting it approximately nine-tenths of a mile for disposal at the New Tijuana River. Additionally, USIBWC handles waste in the flood control conveyance by constructing berms from waste-laden sediment to temporarily block the entrance. (FAC ¶ 62.) Through the construction of the berms, Plaintiffs argue the USIBWC exerts some level of control over the amount of wastewater that flows into and out of the flood control conveyance.

USIBWC asserts that Plaintiffs' argument falsely equates USIBWC's control over its infrastructure with control over waste that passes through that infrastructure. The flood control structure does not enable USIBWC to remove pollutants from the water that passes through it, and USIBWC does not exert any control over waste that enters the Tijuana River in Mexico and flows across the border.

At best, USIBWC transports waste through the flood control conveyance. However, that transportation is passive in nature, merely permitting the waste from Mexico to flow through the system. The FAC does not allege that USIBWC is in any way the source of the wastewater that eventually travels into and through the flood control conveyance. Nor does the FAC alleged that USIBWC actively handles or treats any wastewater in the flood control conveyance. As a result, Plaintiffs have not adequately alleged that USIBWC plays a "more active role with a more direct connection to the waste" that flows through the flood control conveyance. See Hinds, 654 F.3d at 851.

### 2. Canyon Collectors

Defendants argue that neither USIBWC nor Veolia exercise control over waste that flows through the canyon collectors but is not diverted to one of the drains for treatment at the South Bay Plant. The South Bay Plant has a capacity limited to 25 million gallons per

day, and the NPDES Permit sets the effluent limit at the same.  (NPDES Permit at 5.)
Defendants actively transport, handle, and treat the water that enters the canyon collectors'
drains and is pumped to the South Bay Plant.  However, Defendants cannot actively control
wastewater beyond the limitations of the current infrastructure.  As with the flood control
conveyance, the transportation between the border and the drainage points past the canyon
collectors involves passive, not active, transportation.

In a section of the opposition brief addressing standing, Plaintiffs themselves note
the "critical distinction between controlling what flows *into* the Canyon Collector systems
(over which Veolia has no control), and what happens to the waters *after* they are collected
and detained by the system."  (Doc. No. 20 at 32 (italics in original, underlined emphasis
added).)  Wastewater that is not detained by the canyon collectors, like the wastewater that
is never detained in the flood control conveyance, would flow into the Tijuana River Valley
and make its way to the Pacific Ocean regardless of Defendants' actions.  Cf. Zands v.
Nelson, 797 F. Supp. 805, 810 (S.D. Cal. 1992) ("Indeed, this interpretation does no more
than hold defendants responsible for gasoline that would not have been brought onto the
property but for the presence of a gas station.").  Therefore, contribution has not been
alleged sufficiently to state a claim for relief under the RCRA.

Accordingly, the court grants Defendants' motions to dismiss Plaintiffs' third cause
of action with leave to amend.

/ / /

/ / /

/ / /

# CONCLUSION

For the foregoing reasons, the court denies in part and grants in part Defendants' motions to dismiss. The court denies Veolia's motion to dismiss for lack of standing, denies Veolia's motion to dismiss Plaintiffs' CWA claim, and grants Veolia's motion to dismiss Plaintiffs' RCRA claim with leave to amend. The court denies USIBWC's motion to dismiss Plaintiffs' CWA claims, and grants USIBWC's motion to dismiss Plaintiffs' RCRA claim with leave to amend. Plaintiffs may file an amended complaint within 14 days of the entry of this order.

IT IS SO ORDERED.

DATED: August 29, 2018

JEFFREY T. MILLER
United States District Judge

18cv457 JM (JMA)