JONATHAN D. BRIGHTBILL
Deputy Assistant Attorney General
Environment and Natural Resources Division

DEBRA J. CARFORA
(MD State Bar Number N/A)
debra.carfora@usdoj.gov
ANDREW COGHLAN
(CA State Bar Number 313332)
andrew.coghlan@usdoj.gov
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel:  (202) 514-2640
Fax: (202) 514-8865

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITY OF IMPERIAL BEACH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE INTERNATIONAL BOUNDARY & WATER COMMISSION – UNITED STATES SECTION, et al., <br><br> Defendants. | CASE NO. 18-cv-457-JM-LL <br><br> **REPLY IN SUPPORT OF THE UNITED STATES' PARTIAL MOTION TO DISMISS** <br><br> **ORAL ARGUMENT REQUESTED** <br><br> Hearing: November 19, 2018 <br> Time:  9:00 am <br> Judge: Jeffrey T. Miller <br> Place: Courtroom 5D |

At issue in Plaintiffs' first claim is whether the Clean Water Act ("CWA" or "Act") can be construed to require USIBWC to assume legal responsibility for treating an unlimited quantity of wastewater flowing from Mexico. Congress has answered in the negative. CWA section 511(a)(3), 33 U.S.C. § 1371(a)(3), precludes any construction of the Act that would "affect[] or impair[] the provisions of any treaty of the United States." Because Plaintiffs' first claim attempts to limit USIBWC's ability under the 1944 Treaty for the Utilization of the Waters of the Colorado and Tijuana Rivers and of the Rio Grande ("1944 Treaty") to seek from Mexico a binational solution to a binational pollution problem, it must be dismissed.

At issue in Plaintiffs' third claim is whether USIBWC is liable under the Resource Conservation and Recovery Act ("RCRA") for waste that is generated and disposed of in Mexico and that flows into the United States absent any substantial affirmative action by USIBWC. This Court has already answered in the negative and, for the same reasons, should do so again. Also at issue in Plaintiffs' third claim is whether USIBWC had sufficient notice that by stopping the flow of transboundary waste, it might actually worsen pollution in the Tijuana River Valley. Because Plaintiffs gave no such warning and in fact conveyed the opposite message, the remainder of their RCRA claims should likewise be dismissed.

## I. Plaintiffs' First Claim Would Impair or Affect the Provisions of a Treaty and so Fails Under 33 U.S.C. § 1371(a)

### A. § 1371(a) does not require a "conflict" between the CWA and the provisions of a treaty.

In their Response, Plaintiffs first contend that § 1371(a) limits the CWA's waiver of sovereign immunity only where application of the Act would "conflict with a treaty or similar federal obligation." Resp. at 7. This argument runs counter to the CWA's plain text, which has a far broader meaning than the cramped construction urged by Plaintiff.

Reply in Support of the United States' Partial Motion to Dismiss     18cv00457

1

Section 1371(a) precludes constructions of the CWA that "impair[]" or "affect[]" any treaty.  The CWA does not define those terms and so the task of statutory construction "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). While an "actual conflict" between the CWA and a treaty could impair or affect the provisions of the treaty, the words "impair" and "affect" are not narrowly synonymous with "conflict."  Rather, the ordinary meaning of "affect" is "to produce an effect on; to influence in some way," Black's Law Dictionary (10th ed. 2014), or "to produce a material influence upon or alteration in," Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/affect. To "impair" is to "diminish the value of," Black's Law Dictionary (10th ed. 2014), or, more generally, "to diminish in function, ability, or quality[;] to weaken or make worse," Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/impair.  Congress could have limited § 1371(a)'s scope to instances of actual conflict between treaty and statute.  It did not do so and Plaintiffs' construction of the statute must therefore be rejected.

Plaintiffs' sole authority for its atextual reading of § 1371(a), *Save Our Sound Fisheries Association v. Callaway*, 387 F. Supp. 292 (D.R.I. 1974) ("*Save Our Sound*"), is inapposite.  The question in that case was whether the Army Corps of Engineers was required to issue a CWA permit for certain dredging activities related to the deepening of shipping channel and harbor.  The Corps argued that those activities were exempt from CWA permitting requirements under § 1371(a)(2), which precludes applications of the CWA that would impair or affect the Army Corps' authority to maintain navigation.  *Id.* at 305.  The court disagreed, finding that the CWA's "procedural mandates" in no way altered the Army Corps' substantive authority to maintain navigation.  *Id.* at 297.

Reply in Support of the United States' Partial Motion to Dismiss      18cv00457

Crucially, *Save Our Sound* concerned whether the Corps was required to issue a dredge and fill permit under CWA Section 404, 33 U.S.C. § 1344 (a "section 404 permit"), not obtain a NPDES permit, like the one that Plaintiff would impose on the flood control structure.[1] *Id.* at 305. As described in *Save Our Sound*, the issuance of a section 404 permit required "only that the environmental impact of the discharge of dredged materials in navigable waters be publicly analyzed before a particular disposal of dredged spoil is made." *Id.* The imposition of a NPDES permit, by contrast, entails substantive restrictions on "the type and quantity of pollutants" that a permit holder may release. *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) ("*Miccosukee Tribe*").

If Plaintiffs merely sought to compel USIBWC's compliance with certain "procedural mandates" then perhaps *Save Our Sound* would be on point. But Plaintiffs' construction of the CWA would do far more. If required to operate its flood control structure under a NPDES permit, USIBWC would be legally responsible for ensuring the water quality of any transboundary flows through the flood control structure. Whether this open-ended obligation would impair or affect the provisions of the 1944 Treaty and its Minutes is a question for which *Save Our Sound* provides no answer.

**B. The 1944 Treaty and its Minutes do not compel CWA compliance where the CWA does not apply.**

Plaintiffs' reliance on the sections of the 1944 Treaty and its Minutes that record USIBWC's commitment to abide by domestic law is similarly misplaced. *See* Resp. at 8. In arguing that these provisions compel USIBWC to obtain a NPDES permit for the flood control structure, Plaintiffs beg the question of whether the CWA can be construed to regulate the flood control structure in the

---

[1] NPDES permits are issued under CWA section 402, 33 U.S.C. § 1342.

1   first instance.  Clearly, under the 1944 Treaty and its Minutes, USIBWC is bound
2   to follow the CWA when it applies.  But by its plain terms, the CWA cannot be
3   applied to impair or affect the provisions of a treaty.  The heart of the matter then,
4   is whether the construction of the CWA urged by Plaintiffs in their first claim
5   would impair or affect the 1944 Treaty and its implementing Minutes.

### C. Pollution in the flood control structure is a "border sanitation problem" under the 1944 Treaty and its Minutes.

Plaintiffs wish away the foreign policy implications of their suit by framing their first claim as an application of domestic law to a purely domestic problem. Resp. at 9–10.  This construction is untenable, however, because, as this Court observed, "the border complicates matters."  *City of Imperial Beach v. Int'l Boundary & Water Comm'n-United States Section*, No. 18CV457 JM (JMA), 2018 WL 4104235, at *7 (S.D. Cal. Aug. 29, 2018).

The flood control structure is a simple concrete channel that abuts the border, where it connects with the channelized portion of the Tijuana River that passes through Tijuana, Mexico.  The flood control structure neither adds, nor is alleged to add, pollutants to the waters that pass through it.  Rather, any pollutants in the flood control structure necessarily originated in, and flowed over the border from, Mexico.  Indeed, Plaintiffs relied on this very point in opposing the United States motion to dismiss the First Amended Complaint.  *See City of Imperial Beach*, 2018 WL 4104235, at *7  ("Plaintiffs argue [that] . . . the polluted water in the flood control conveyance comes from a body of water in Mexico").  Plaintiffs cannot have it both ways. Either pollution in United States stretches of the Tijuana River is a purely domestic issue with no international dimension, in which case claim two is facially deficient under the *Miccosukee Tribe* line of cases, see *id.* at *7, or pollution in  United States stretches of the Tijuana River is a transboundary issue, in which case it is a border "sanitation problem" subject to the 1944 Treaty and its Minutes.

### D. Plaintiffs' construction of the CWA would impair or affect USIBWC's implementation of existing treaty rights and obligations.

If governed by a NPDES permit, flows through the flood control structure would automatically be subject to "numerous Clean Water Act provisions . . . includ[ing] effluent limitations [and] water-quality standards." *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 673 F.3d 880, 885 (9th Cir. 2011), *rev'd on other grounds sub nom. Los Angeles Cty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78 (2013). Any transboundary flow exceeding those limitations and standards would be actionable under the CWA the moment that it exited the flood control structure. Plaintiffs' construction of the CWA would thus vastly expand the scope of USIBWC's responsibility for treating Mexico's wastewater.

No matter, Plaintiffs claim, because regardless of USIBWC's obligations under the CWA, it "would remain free to negotiate transboundary pollution issues" with Mexico. Resp. at 9. This freedom to negotiate would mean little, however, if USIBWC bore ultimate responsibility for any pollution that entered the flood control structure. Even if Mexico agreed, for example, to eliminate waste from the Tijuana River, Plaintiffs' construction of the CWA would make USIBWC the guarantor of Mexico's commitment. Any failure by Mexico to halt the flow of pollutants in the Tijuana River could create a private right of action against USIBWC. Another nation's treaty obligation would, in effect, become enforceable against the United States by means of citizen suit. That arrangement is nowhere contemplated in the 1944 Treaty or its Minutes and would unavoidably affect or impair implementation of the provisions of the 1944 Treaty and Minutes that

commit the United States and Mexico to seek binational solutions to border sanitation problems that allocate responsibilities between the two countries.[2]

In sum, Plaintiffs would use the CWA to reorder USIBWC's negotiated treaty arrangements with Mexico. In so doing, they would both vastly expand USIBWC's responsibility for treating Mexico's waste and would constrain USIBWC's full exercise of its ability to explore and implement binational solutions to a binational problem pursuant to the 1944 Treaty and its Minutes. Section 1371(a) forecloses this outcome. Plaintiffs' first claim should therefore be dismissed.

## II. Plaintiffs Have Not Brought a Cognizable RCRA Claim

The contribution element of a RCRA claim requires: (1) active involvement with, or some measure of control over, waste, *Hinds Investments L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011); and (2) "some level of causation between the contamination and the party to be held liable." *Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.*, 138 F. Supp. 2d 482, 487 (S.D.N.Y. 2001).

Before filing suit, a prospective RCRA plaintiff must give the alleged violator notice of "the activity alleged to constitute a violation." 40 C.F.R. § 254.3(a). Compliance with RCRA's notice requirement is a jurisdictional prerequisite. *Covington v. Jefferson Cnty.*, 358 F.3d 626, 636 (9th Cir. 2004). Failure to provide notice sufficient to give "the accused . . . the opportunity to

---

[2] The prior CWA suits against USIBWC that Plaintiffs cite (Resp. at 9) all concerned works that USIBWC built under agreements with Mexico, to receive, treat, and dispose of certain quantities of Mexico's wastewater. The NPDES permits in those cases did not foist on USIBWC unilateral legal responsibility for an unlimited quantity of additional waste, as Plaintiffs seek to do here. There is nothing inconsistent, let alone "contradict[ory]," Resp. at 10, about USIBWC's past (and ongoing) submission to NPDES permitting requirements, and its objections to the construction of the CWA now urged by Plaintiffs in their first claim.

correct the problem" is therefore grounds for dismissal pursuant to Rule 12(b)(1). *Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917 (9th Cir. 2004) (internal citations and quotations omitted).

Plaintiffs' third claim encompasses two distinct theories of RCRA liability. According to Plaintiffs, USIBWC contributes to an imminent and substantial endangerment either (1) by failing to stop transboundary wastewater from flowing through its facilities; or (2) by constructing sediment berms that impede "the natural flow of solid and and/or hazardous wastes" into the Tijuana River Valley. SAC ¶ 128.b.i.

The problem with Plaintiffs' first theory is that the Court has already rightly rejected it. *City of Imperial Beach*, 2018 WL 4104235, at *10–11. In pressing that theory again here, Plaintiffs contend that the Court misinterpreted *Hinds* and should therefore confess error and reconsider its earlier decision. Not so. As this Court correctly noted, USIBWC has no active involvement with waste that flows by gravity through passive works. *Id.* at *11. Nor has USIBWC exercised control over, or caused, the transboundary flows of wastewater that move through the flood control structure and that exceed the canyon collectors' detention capacity. *Id.* On these bases, any allegations concerning uncaptured wastewater should again be dismissed for failure to state a claim for contributor liability under RCRA.

The problem with Plaintiffs' second theory of RCRA liability is that their Notice of Intent to Sue Letter ("NOI letter," SAC, Ex. A) nowhere mentions berms, or any related "desiccat[ion]" of waste and subsequent "slug-flows." SAC ¶ 102. The reason for this fatal failure of notice is evident. Plaintiffs raised their berm-based theory of liability for the first time in the Second Amended Complaint. The NOI letter, on the other hand, was based on Plaintiffs' original theory of liability: that the mere passage of wastewater through USIBWC's facilities, in and of itself, violated RCRA.

Reply in Support of the United States' Partial Motion to Dismiss       18cv00457

Of the canyon collectors, Plaintiffs' NOI letter states: "IBWC and Veolia have contributed and continue to contribute to the disposal of solid waste contained in the transboundary wastewater *when that wastewater overflows, leaks, or spills from the conveyance structures* and is deposited on land or into the Tijuana River . . . ." NOI at 23. And of the flood control structure, the NOI letter alleges that USIBWC "moves and *discharges solid wastes from the flood control conveyance into the unlined portion of the Tijuana River Valley* in the United States. *Id.* at 24. Indeed, each alleged instance of violation in Tables 1, 2, and 3 of the NOI letter concerns the flow of wastewater *out of* a USIBWC-owned facility.

Notice of a RCRA claim is adequate only if it "tells a target precisely what [the target] allegedly did wrong." *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 801 (9th Cir. 2009). The only conclusion to be drawn from Plaintiffs' NOI letter is that USIBWC violates RCRA by failing to contain the flow of wastewater inside its facilities. The obvious response to this allegation would be to somehow restrict that flow. According to Plaintiffs, USIBWC's sediment berms do exactly that. SAC ¶¶ 63, 102. If impeding the "natural flow" of transboundary wastewater poses the imminent and substantial endangerment that Plaintiffs now claim that it does, then their NOI letter wholly fails to make that assertion.

It is immaterial that USIBWC constructed the berm in the flood control structure after Plaintiffs sent their NOI letter. Resp. at 12. The issuance of an NOI letter does not suspend notice requirements for new and different alleged violations. *See, e.g.*, *San Francisco Baykeeper v. Levin Enter., Inc.*, 12 F. Supp. 3d 1208, 1233 (N.D. Cal. 2013) (finding that NOI letter was adequate as to certain CWA claims, but not as to related but distinct claims that were raised for the first

time in the complaint).³ *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000), cited by Plaintiffs, does not hold otherwise. There the Ninth Circuit found that a defendant that received adequate notice of alleged CWA violations could not render that notice retroactively inadequate by taking actions to remedy the alleged violations. 236 F.3d at 997–98. Under *Southwest Marine*, in other words, Plaintiffs' NOI letter was sufficient "on the date it was mailed," but only as to those claims that could be fairly gleaned from it. *Id.* at 997. Plaintiffs' berm-based claims are nowhere to be found in its NOI letter and so must be dismissed.

The harm here alleged comes from the uncaptured flow of transboundary wastewater. Realizing that the gravitational movement of wastewater through passive works is an insufficient basis for RCRA liability, Plaintiffs have concocted a new theory based not on the flow of wastewater but on the prevention of that flow. This reversal has nothing to do with reality. Fatal lack of notice aside, Plaintiffs' berm-based claims are implausible on their face.

## CONCLUSION

For these reasons, Plaintiffs' first claim should be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Plaintiffs' third claim should also be dismissed under Rule 12(b)(1) to the extent that it is premised on allegations not contained in the NOI letter. The remainder of Plaintiffs' third cause of action should be dismissed under Rule 12(b)(6).

---

³ Plaintiffs referenced the flood control structure's berm in their First Amended Complaint, dated May 29, 2018. FAC ¶ 62. If they wished to bring a RCRA claim based on the imminent and substantial endangerment posed by that berm, they could have filed an NOI letter on or before that date. Had they done so, the notice period would have run weeks before the filing of the Second Amended Complaint.

Reply in Support of the United States' Partial Motion to Dismiss     18cv00457

9

Respectfully submitted this 2nd day of November, 2018.

                JONATHAN D. BRIGHTBILL
                Deputy Assistant Attorney General

                /s/ Andrew S. Coghlan
                DEBRA J. CARFORA
                ANDREW S. COGHLAN
                Attorneys for Defendant
                International Boundary and Water
                Commission, United States Section

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 2, 2018, a true and correct copy of the foregoing Partial Motion to Dismiss was served electronically via the Court's e-filing system to Counsel of Record.

/s/ *Andrew Coghlan*
ANDREW COGHLAN