UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF IMPERIAL BEACH; SAN DIEGO UNIFIED PORT DISTRICT; and CITY OF CHULA VISTA,<br><br>                    Plaintiffs,<br><br>v.<br><br>INTERNATIONAL BOUNDARY AND WATER COMMISSION, UNITED STATES SECTION; and VEOLIA WATER NORTH AMERICA WEST, LLC,<br><br>                    Defendants. | Case No.: 18cv457 JM (JMA)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |

On September 26, 2018, Defendants the International Boundary & Water Commission – United States Section ("USIBWC") and Veolia Water North America – West, LLC ("Veolia") (collectively, "Defendants") filed separate motions to dismiss. (Doc. Nos. 32, 33.) Plaintiffs the City of Imperial Beach, San Diego Unified Port District, and the City of Chula Vista (collectively, "Plaintiffs") oppose the motions. (Doc. No. 37.) Having carefully considered the matters presented, the court record, and the arguments of counsel, the court grants in part and denies in part both motions.

/ / /

/ / /

/ / /

# BACKGROUND[1]

This case arises out of the management and operation of facilities in the Tijuana River Valley intended to direct and treat water flowing from Mexico across the international border into the United States. On September 27, 2017, Plaintiffs sent Defendants a Notice of Intent ("NOI") indicating Plaintiffs' intent to sue Defendants for violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b), and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B). (Doc. No. 31.) The NOI informed Defendants that their discharge of pollutants into the Tijuana River Valley violated both the CWA and RCRA. On March 2, 2018, Plaintiffs initiated this action against Defendants. (Doc. No. 1.) On June 12, 2018, USIBWC and Veolia moved to dismiss the First Amended Complaint ("FAC"), arguing in part that Plaintiffs failed to state a RCRA claim. On August 29, 2018, the court granted in part and denied in part Defendants' motions to dismiss, dismissing Plaintiffs' RCRA claim with leave to amend. (Doc. No. 26.)

On September 12, 2018, Plaintiffs filed the operative Second Amended Complaint ("SAC"). (Doc. No. 31.) The SAC alleges three causes of action: (1) against USIBWC, for discharges of pollutants from the flood control conveyance without a National Pollutant Discharge Elimination System ("NPDES") permit in violation of the CWA, 33 U.S.C. §§ 1311(a), 1342; (2) against both Defendants, for discharges of pollutants from the canyon collectors in violation of the CWA and the NPDES Permit; and (3) against both Defendants, for contribution to an imminent and substantial endangerment in violation of RCRA. Defendants' motions to dismiss followed on September 26, 2018.

///

///

///

---

[1] The facts in this section are drawn from the relevant complaints and submissions from the parties, and, at this stage, are taken as true to the extent they are well pled.

## I. The Parties

### A. Plaintiffs

The City of Imperial Beach is a California General Law City and municipal corporation, organized and existing by virtue of the laws of the State of California. The San Diego Unified Port District is a public entity created by the San Diego Unified Port District Act, California Harbors & Navigation Code, Appendix 1, § 1 et seq. The City of Chula Vista is a California Charter City and municipal corporation, organized and existing by virtue of the laws of the State of California and the Charter of the City of Chula Vista.

### B. Defendants

The USIBWC is an agency and instrumentality of the United States government charged with addressing transboundary issues arising out of agreements between the United States and Mexico, including the Treaty of February 3, 1944, for the Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande ("1944 Treaty"). Veolia is a limited liability company incorporated in Delaware and headquartered in Massachusetts. Veolia contracts with USIBWC to operate and maintain the South Bay International Wastewater Treatment Plant ("South Bay Plant") and its associated facilities.

## II. The International Boundary and Water Commission

The International Boundary and Water Commission ("Commission") is a bi-national body comprised of the USIBWC and the Comisión Internacional de Límites y Aguas ("CILA") in Mexico. Both sections of the Commission exercise the rights and obligations of their governments under the 1944 Treaty. Under the 1944 Treaty,

> Neither Section [the USIBWC or CILA] shall assume jurisdiction or control over works located within the limits of the country of the other without the express consent of the Government of the latter. The works constructed, acquired or used in fulfillment of the provisions of this Treaty and located wholly within the territorial limits of either country, although these works may be international in character, shall remain, except as herein otherwise specifically provided, under the exclusive jurisdiction and control of the Section of the Commission in whose country the works may be situated.

(Doc. No. 33-2 ("1944 Treaty") Art. 2.)

### III.    South Bay Plant

Decisions of the Commission are recorded in Minutes. In 1990, the Commission entered into an agreement known as Minute 283 to address the border sanitation problem in San Diego, California, and Tijuana, Baja California. (Doc. No. 16-2 ("Minute 283").) Among other things, Minute 283 led to the construction of the South Bay Plant.

The South Bay Plant is located in the Tijuana River Valley in the City of San Diego, San Diego County, California. The South Bay Plant was designed to handle 25 million gallons per day, based on a 30-day average, "to treat sewage generated in excess of the capacity" of facilities in Mexico. (Minute 283 at 4.) USIBWC owns the South Bay Plant, and Veolia operates it. The South Bay Plant and its associated facilities are subject to the terms of NPDES permit No. CA0108929 (the "NPDES Permit"). The NPDES Permit authorizes discharges of pollutants at the South Bay Ocean Outfall only, and only after such pollutants have gone through secondary treatment at the South Bay Plant. All other discharges are prohibited.



(SAC at 17.)

The primary influent to the South Bay Plant is sewage from Mexico. (SAC ¶ 58.) While a CILA Diversion exists in Mexico to divert flows in the Mexican Tijuana River into the transboundary sewage system, it "frequently malfunctions, allowing sewage to flow past the Diversion and across the U.S./Mexico Border." (SAC ¶ 59.)

## C. Canyon Collectors

Water that crosses the border into the United States from Mexico west of the flood control conveyance does so at six discernible locations: Yogurt Canyon, Goat Canyon, Smuggler's Gulch, Canyon Del Sol, Silva Drain, and Stewart's Drain. USIBWC owns and Veolia operates and maintains canyon collectors at five of these locations, excluding Yogurt Canyon.



(SAC at 16.)

The canyon collectors are among the facilities that operate under and are subject to the South Bay Plant NPDES Permit. They are "designed to capture and detain polluted wastewater the moment it crosses the U.S./Mexico Border into the United States." (SAC ¶ 66.) Each concrete collector abuts the border and spans the opening of one of the drainage

18cv457 JM (JMA)

points. The canyon collectors collect and direct wastewater into a shallow detention basin. Wastewater in the detention basin is then directed to a screened drain inlet ("collector inlet") regulated by a valve. When open, the water in the detention basin is accepted into a pipe system and conveyed to the South Bay Plant for treatment and eventual discharge at the South Bay Ocean Outfall. When closed, the water cannot drain into the treatment system, and instead overflows the detention basin and travels into the downstream drainages. Waste that does not flow through the treatment system collects in the canyon collector basins.

**IV.    Flood Control Conveyance**

In 1978, USIBWC constructed a flood control conveyance designed to capture as much as 135,000 cubic feet of water per second from the Tijuana River as it crosses the border from Mexico into the United States. (SAC ¶ 43.) The flood control conveyance is a discrete, concrete-lined conveyance with banked sides that begins at the United States border with Mexico. It directs water, sewage, and other waste into an area of the Tijuana River Valley west of the historical course of the Tijuana River, in which the Tijuana River had not previously flowed.

The flood control conveyance is not subject to the NPDES Permit, and Veolia is not involved in its operation. Plaintiffs allege that USIBWC routinely discharges pollutants and solid and/or hazardous waste, captured from the Mexican portion of the Tijuana River, out of the flood control conveyance.

At times, the flow of wastewater in the flood control conveyance is slowed or completely halted. USIBWC recently constructed temporary earthen berms at the border between the United States and Mexico to reduce the volume of flow into the flood control conveyance from the Tijuana River in Mexico, redirecting those flows south into the CILA Diversion. However, Plaintiffs note that the berm is not designed to protect against high volume flows and may wash out with even the slightest amount of precipitation. The berm also temporarily detains wastewater, causing water to pool in the flood control conveyance.

In addition, Plaintiffs allege that the structure of the flood control conveyance was intentionally designed to slow the flow of water.



(SAC at 14.)

## LEGAL STANDARDS

### I.    Rule 12(b)(1) – Lack of Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998). As the party asserting claims, Plaintiffs bear the burden of establishing jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

### II.    Rule 12(b)(6) – Failure to State a Claim

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the pleadings. To overcome such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

7

the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Facts merely consistent with a defendant's liability are insufficient to survive a motion to dismiss because they establish only that the allegations are possible rather than plausible. Id. at 678–79. The court must accept as true the facts alleged in a well-pled complaint, but mere legal conclusions are not entitled to an assumption of truth. Id. The court must construe the pleading in the light most favorable to the non-moving party. Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995).

## DISCUSSION

### I. Sovereign Immunity

Plaintiffs allege that USIBWC discharges pollutants without an NPDES permit and in violation of the CWA when wastewater exits the flood control conveyance into the Tijuana River. (SAC ¶¶ 103-14.) USIBWC argues that this claim is barred by sovereign immunity. Application of the CWA to the flood control conveyance, USIBWC argues, will affect or impair the 1944 Treaty. USIBWC does not argue that Plaintiffs' other claim—alleging that Defendants' discharges from the canyon collectors violate USIWBC's NPDES permit—is barred by sovereign immunity.

### A. Scope of Waiver

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994). The absence of consent deprives the court of jurisdiction to hear the case. Id. A "waiver of sovereign immunity must be 'unequivocally expressed' in statutory text." F.A.A. v. Cooper, 566 U.S. 284, 290 (2012). "Any ambiguities in the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." Id. (internal citation omitted). Ambiguity exists "if there is a plausible interpretation of the statute" that would not result in waiver of sovereign immunity. Id. at 290-91. This canon of construction is a tool for interpreting statutes that should be applied in addition to other traditional statutory interpretation tools. Id. at 291.

8

Congress unequivocally consented to suit under the CWA.  Section 505(a)(1) of the CWA allows "any citizen" to file suit against a person alleged to be in violation of an effluent standard or limitation under that chapter "including . . . the United States . . ." 33 U.S.C. § 1365(a).  Plaintiffs allege that USIBWC is in violation of an effluent standard or limitation provided by the CWA.  Thus, the question is the scope of this waiver.

Section 511(a) of the CWA provides that the Act—

> shall not be construed as (1) limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter; (2) affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation . . ., or (3) <u>affecting or impairing the provisions of any treaty of the United States</u>.

33 U.S.C. § 1371(a) (emphasis added).  This section is a general provision applicable to the entirety of the CWA.  <u>See id</u>.

The court is not aware of any other case involving the interplay of § 511(a) and the sovereign immunity waiver of § 505(a)(1).  A number of courts, however, have concluded that the parallel language of § 511(a)(2) provides a limitation on the sovereign immunity waiver provided in § 313 of the CWA.[2]  Sovereign immunity bars suits "affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation . . ."  <u>See, e.g.</u>, <u>In re Operation of Missouri River Sys. Litig.</u>, 418 F.3d 915 (8th Cir. 2005) (finding § 511(a)(2) unambiguously limits the partial sovereign immunity waiver provided by § 313); <u>North Dakota v. U.S. Army Corps of Engineers</u>, 270 F. Supp. 2d 1115, 1123 (D.N.D. 2003) ("While there is no question that Section 313 of the Clean Water Act

---

[2] Section 313 provides in relevant part: "Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity . . . ."  33 U.S.C. § 1323(a).

[33 U.S.C. § 1323] constitutes a partial waiver of sovereign immunity, there is also no question that Section 511 [33 U.S.C. § 1371] provides sovereign immunity protection for the Corps of Engineers when compliance with the Clean Water Act may 'affect or impair' the authority of the Corps of Engineers to "'maintain navigation.'"). The same reasoning applies to § 511(a)(3) in this case.

Section 511(a)(3) unambiguously limits the partial waiver of sovereign immunity provided by § 505(a)(1). <u>See id</u>. Section 511 is a general provision applicable to the entirety of the CWA. It provides that the CWA shall not be construed as affecting or impairing the provisions of any treaty. This directive applies to construction of the waiver of sovereign immunity in § 505(a)(1) allowing for citizen suits. <u>Cf</u>. <u>Daniel v. Nat'l Park Serv.</u>, 891 F.3d 762, 769 (9th Cir. 2018) ("We begin with the principle that our duty is to construe statutes, not isolated provisions.") (internal quotation and citation omitted). The United States consented to suit under the CWA citizen suit provision, but only to the extent that it does not affect or impair a treaty.

## B. Whether the 1944 Treaty Is Affected or Impaired

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." <u>Id</u>. A "jurisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." <u>Id</u>. (internal quotations and citation omitted). "The question of jurisdiction and the merits of an action are intertwined where a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." <u>Id</u>. (internal quotations and citation omitted).

The question is whether Plaintiffs' claim requires USIBWC to take action "affecting or impairing" the 1944 Treaty. The CWA does not define the phrase "affecting or impairing." Black's Law Dictionary defines "affect" as "[m]ost generally, to produce an effect on; to influence in some way." Black's Law Dictionary (10th ed. 2014). Black's Law Dictionary defines "impair" as "to diminish the value of." Id. Absent application of any other canon of construction, "affect" and "impair" should be construed broadly in favor of the sovereign. See Cooper, 566 U.S. at 291.[3]

USIBWC argues that its negotiating position with Mexico under the 1944 Treaty and relevant Minutes will be impaired or affected if the flood control conveyance is subject to the CWA. If required to operate the flood control conveyance under an NPDES permit, USIBWC argues, it will be "legally responsible for ensuring the water quality of any transboundary flows that pass through the flood control conveyance." (Doc. No. 40 at 4.) This "new, open-ended obligation," (id.), will "compel USIBWC to develop a unilateral, domestic solution to the international problem of pollution in the Tijuana River." (Doc. No. 33-1 at 16.)

USIBWC concedes that operating the canyon collectors in compliance with its current NPDES permit does not affect or impair the 1944 Treaty. This is because, USIBWC argues, the United States and Mexico already negotiated an agreement to address

---

[3] Plaintiffs cite to Save Our Sound Fisheries Ass'n v. Callaway, 387 F. Supp. 292 (D.R.I. 1974) for the proposition that the "affect or impair" language of § 511(a) should not be read broadly and should only bar suits that "would conflict with a treaty or similar federal obligation." (Doc. No. 37 at 13.) This case held that the "requirement of obtaining a permit under 33 U.S.C. § 1344 for the discharge of dredged material into navigable waters, after notice and opportunity for public hearings, cannot be said to 'affect or impair' the authority of the Secretary of the Army to maintain navigation." Id. at 305. The court declined to read § 511(a) as a broad exemption from permitting requirements, as defendants urged. But the court did not hold that the "affect or impair" language of § 511(a) was limited to situations where the obligation would "conflict" with the ability to maintain navigation. Furthermore, the court was not deciding whether this provision affected the scope of a waiver of sovereign immunity, as is at issue here.

the problem of transboundary flows through the Tijuana tributary canyons—Minute 283.[4] USIBWC argues that Minute 283 assumes that works within the United States are subject to CWA regulation. See Minute 283 at 4 ("Because water quality standards are more strict in the United States, the construction, operation and maintenance of the land and deep ocean outfalls would be financed by the United States in recognition of the potential benefits to the Tijuana River Estuary and United States Beaches in San Diego County, California."). Unlike the canyon collectors, USIBWC argues, the Commission has not agreed on a Minute to address the border sanitation problem presented by discharges from the flood control conveyance.

Plaintiffs argue that application of the CWA to the flood control conveyance will not affect or impair the 1944 Treaty. They argue that the Treaty already requires the United States to comply with domestic water quality standards, including the CWA. The 1944 Treaty provides that works within the United States remain under the exclusive jurisdiction and control of USIBWC, 1944 Treaty, Art. 2, and that the United States "shall assume responsibility for and adjust exclusively in accordance with its own laws all claims arising within its territory in connection with the construction, operation, or maintenance" of the works agreed upon under the Treaty. Id. at Art. 20. Minute 261, relating to "border sanitation problems," recognizes "that each country in dealing with its sanitation problems has its own quality standards, determined by the authorities responsible for safeguarding public health and well-being of its inhabitants." Minute 261 at 1.[5]

---

[4] As discussed above, the Commission entered into an agreement known as Minute 283 to address the border sanitation problem. Among other things, Minute 283 led to the construction of the South Bay Plant and canyon collectors.

[5] Plaintiffs also argue that an NPDES permit would not affect or impair the 1944 Treaty as it would only regulate the quality of *domestic* water discharged from the flood control conveyance, not what enters the conveyance. This distinction is unpersuasive. The SAC alleges that the flood control conveyance was designed to capture water from Mexico at the precise moment that it crosses the international border into the United States and that it was built pursuant to a bi-national agreement. (SAC ¶ 60.)

Whether Plaintiffs' CWA claim will affect or impair the 1944 Treaty is a question of fact that cannot be answered by the pleadings or evidence before the court. It is possible that requiring USIBWC to comply with the CWA for discharges from the flood control conveyance will affect or impair the 1944 Treaty and relevant Minutes. But the SAC does not indicate whether compliance with the CWA will affect or impair the 1944 Treaty. Nor do the Treaty or Minutes. USIBWC mounts a "factual attack" against Plaintiffs' claim. See Safe Air for Everyone, 373 F.3d at 1039. The court would need to make factual findings outside of the pleadings to reach a conclusion on this question. And USIBWC fails to present sufficient evidence to support any such finding. First, USIBWC fails to identify what compliance with the CWA would require. USIBWC itself refers to the "new, open-ended obligation" that application of the CWA would create, without defining this obligation. Even if Plaintiffs succeed on their first claim and USIBWC is required to obtain an NPDES permit, the terms of the permit are unknown. Second, the SAC and 1944 Treaty do not indicate how USIBWC's new (undefined) obligation will affect or impair the Treaty. USIBWC presents no evidence on this issue. USIBWC concedes that operating the canyon collectors under the constraints of an NPDES permit does not affect or impair the 1944 Treaty, but argues that requiring a permit at the flood control conveyance will affect the Treaty. At oral argument, USIBWC argued that the terms of an NPDES permit regulating discharges from the flood control conveyance would impose a much broader obligation than that imposed by the NPDES permit regulating the canyon collectors. USIBWC supports its argument with hypotheticals, but no evidence.

USIBWC fails to present sufficient evidence for the court to find that compliance with the CWA would affect or impair the 1944 Treaty. USIBWC's motion to dismiss Plaintiffs' first claim on sovereign immunity grounds is denied.

## II.   RCRA

Plaintiffs' third claim asserted against both Defendants is for violation of RCRA. (SAC ¶¶ 125-33.)

RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." <u>Meghrig v. KFC W., Inc.</u>, 516 U.S. 479, 483 (1996). Its primary purpose is "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" <u>Id.</u> (quoting 42 U.S.C. § 6902(b)). RCRA permits citizen suits against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

## A. Notice of Intent

On September 27, 2017, Plaintiffs sent Defendants a Notice of Intent to Sue ("NOI"). (Doc. No. 31 at 43-72.) Defendants argue that the NOI failed to provide adequate notice of the new RCRA allegations in the SAC. The court disagrees.

The citizen suit provision of RCRA provides that no action may be commenced "prior to ninety days after the plaintiff has given notice of the endangerment to—(i) the Administrator; (ii) the State in which the alleged endangerment may occur; and (iii) any person alleged to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in subsection (a)(1)(B) of this section." 42 U.S.C. § 6972(b)(2)(A). Notice "gives the alleged violator 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" <u>Hallstrom v. Tillamook Cty.</u>, 493 U.S. 20, 29 (1989) (quoting <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.</u>, 484 U.S. 49, 58 (1987)). It also provides state and federal agencies with the opportunity to take action on the alleged violation. <u>Hallstrom</u>, 493 U.S. at 29. Failure to provide adequate notice bars a plaintiff from filing an action, <u>Id.</u>, and deprives the court of subject

matter jurisdiction.  <u>Waterkeepers N. California v. AG Indus. Mfg., Inc.</u>, 375 F.3d 913, 916 (9th Cir. 2004) ("AG Industrial").[6]

Plaintiffs must provide notice that, among other requirements, "include[s] sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation . . ." 40 C.F.R. § 254.3(a).  "To provide proper notice of an alleged violation, a would-be plaintiff must '[a]t a minimum . . . provide sufficient information . . . so that the [notified parties] could identify and attempt to abate the violation."  <u>Klamath-Siskiyou Wildlands Ctr. v. MacWhorter</u>, 797 F.3d 645, 651 (9th Cir. 2015) (alterations in original) (quoting <u>Sw. Ctr. for Biological Diversity v. United States Bureau of Reclamation</u>, 143 F.3d 515, 522 (9th Cir. 1998)).  A court should ask whether "in practical terms, the notice was sufficiently specific to inform the alleged violator about what it was doing wrong," so that the violator knew what corrective actions to take.  <u>ONRC Action v. Columbia Plywood, Inc.</u>, 286 F.3d 1137, 1143 (9th Cir. 2002) (quotations and citation omitted).

A notice "is not required to list every specific aspect or detail of every alleged violation.  Nor is the citizen required to describe every ramification of a violation."  <u>Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy</u>, 305 F.3d 943, 951 (9th Cir. 2002) (quoting <u>Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc.</u>, 50 F.3d 1239, 1248 (3d Cir. 1995)).  A notice may be sufficient even when it does not specify each event if a defendant is accused of committing multiple violations that are "sufficiently similar" to those contained in the notice.  <u>See, e.g.</u>, <u>San Francisco BayKeeper, Inc. v. Tosco Corp.</u>,

---

[6] Decisions construing CWA notice requirements are also applicable in the RCRA context because "[t]he 60-day notice provisions under the Resource Conservation and Recovery Act and the Clean Water Act are [both] modeled after § 304 of the Clean Air Amendments."  <u>ONRC Action v. Columbia Plywood, Inc.</u>, 286 F.3d 1137, 1146 n.2 (9th Cir. 2002)

309 F.3d 1153, 1158 (9th Cir. 2002) (notice sufficient without listing every event where fourteen dates of alleged wrongdoing were listed on the notice, not all dates of wrongdoing were available to plaintiff, and the notice provided that petroleum coke contamination occurred on each day of ship loading when it spilled into a slough and during rain events when uncovered coke piles washed into the slough); <u>Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy</u>, 305 F.3d 943, 953 (9th Cir. 2002) (notice sufficient where violations "originated from the same source, were of the same nature, and were easily identifiable"). But when a notice states that a defendant committed one specific violation, a defendant is "not required to speculate as to all possible attacks . . . that might be added to a citizen suit at a later time." <u>Marina Point</u>, 566 F.3d at 802 (citation omitted) (notice insufficient where it did not identify which provisions of the statute defendants violated, which wetlands were affected, or specific dates); <u>ONRC Action</u>, 286 F.3d at 1143 (notice insufficient where it only informed defendant that its permit renewal application was untimely but plaintiffs also alleged defendant's permit was invalid because the renewing agency lacked authority for renewal).

The NOI informed Defendants that Plaintiffs intended to sue based on Defendants' frequent discharge of pollutants from the canyon collectors and flood control conveyance. NOI at 2. It characterized the violations as follows: "[C]anyon collector discharges deposit solid and/or hazardous waste near the collectors. Transboundary wastewater[7] discharge events through the flood control conveyance and Yogurt Canyon dispose of solid and/or hazardous wastes in and near the [Tijuana] River Valley." <u>Id</u>. at 21. "IBWC and Veolia have and continue to contribute to the handling and transport of solid and/or hazardous wastes contained in transboundary wastewater influent from the moment such influent enters the canyon collector system, and during the flow of that material through IBWC-owned and Veolia-operated conveyance structures toward the canyon collector drains." <u>Id</u>.

---

[7] "Wastewater" refers to "water containing dangerous pollutants and wastes, including, but not limited to, raw sewage, metals, and chemicals." <u>Id</u>. at 2.

at 23. Defendants "have contributed and continue to contribute to the disposal [ ] of solid and/or hazardous wastes contained in the transboundary wastewater when that wastewater overflows, leaks, or spills from the [canyon collector] conveyance structures and is deposited on land or into the Tijuana River and/or Estuary, or to the natural drainages that are tributaries to those waters." Id. "IBWC through its operation of the flood control conveyance, moves and discharges solid and hazardous wastes from the flood control conveyance into the unlined portion of the Tijuana River Valley in the United States . . . ." Id. at 24. There are "nearly continuous unpermitted discharges from the canyon collectors," id. at 8, and "[a]dditional discharges [from the flood control conveyance] occur during virtually every wet weather event, but IBWC does not report wet weather discharges . . . ." Id. at 7. The waste in these flows "broadly include pathogens, metals, industrial process chemicals, and others, [and] are known to cause acute illness, increased risk of cancer, death, and other maladies in humans." Id. at 23. "Human exposure to these contaminants is likely when, after they are discharged to land, subsequent flow events wash residuals into the Tijuana River and Estuary, and the Pacific Ocean." Id.

The SAC newly alleges that the design of the flood control conveyance and canyon collectors, and the construction of sediment berms, alter the quality and character of waste discharged from the canyon collectors and flood control conveyance. The berms, coupled with the design of the flood control conveyance and canyon collectors, temporarily slow and detain the flow of wastewater. This causes the water to pool and creates an environment that allows pathogens to multiply. This "highly concentrated" waste is flushed from the canyon collectors and flood control conveyance during high flow events. The waste ultimately reaches the Tijuana River, Estuary, and Pacific Ocean where human exposure is likely.

Defendants argue that the NOI does not reference the sediment berms in the flood control structure and canyon collectors, highly concentrated flows allegedly created by the berms and canyon collector basins, or any obstruction of wastewater flow. Instead,

Defendants argue, the NOI focuses on "the mere passage of wastewater through USIBWC's facilities." (Doc. No. 40 at 8.)

Plaintiffs argue that the NOI provided Defendants with sufficient information to take ameliorative steps and that Plaintiffs could not have mentioned the sediment berms in the NOI because the berms did not exist when the letter was sent. In fact, Plaintiffs argue, Defendants' construction of the berms was a misguided attempt to mitigate the violations described in the NOI. (Doc. No. 37 at 18.)

The NOI provided Defendants with sufficient notice of these alleged violations. The berms and design of the facilities are part and parcel of the overarching issue detailed in the NOI—discharge of waste from the canyon collectors and flood control conveyance. Defendants constructed the berm in the flood control conveyance in an attempt to solve this issue and direct more wastewater into the CILA and South Bay Plant. (SAC ¶¶ 63, 84.) But during high flow events, the berm washes out and is insufficient to capture and redirect the flow of wastewater. (Id. at ¶¶ 63, 84, 128.) In lower flow and dry events, the berm makes the problem worse by impeding water flow and fostering pathogen growth. (Id.) Similarly, the design of the canyon collectors and flood control conveyance temporarily detain wastewater, fostering pathogen growth during times of lower water flow. The ultimate harm alleged as a result of these actions is the discharge of waste and pathogens from the canyon collectors and flood control conveyance during high flow events. The NOI discusses this discharge of waste in detail and, like the SAC, states that the waste eventually reaches the Tijuana River, Estuary, and Pacific Ocean where human exposure is likely. The NOI notified Defendants of the source of the violation (overflow from the canyon collectors and discharges from the flood control conveyance terminus), when the violation occurred (continuously for the canyon collectors and during every wet weather event for the flood control conveyance), and the harm caused by the violation (human and environmental exposure caused by flow events that wash pathogens and other waste into the Tijuana River, Estuary, and Pacific Ocean).

USIWBC cites <u>San Francisco Baykeeper v. Levin Enterprises, Inc.</u>, 12 F. Supp. 3d 1208 (N.D. Cal. 2013) for the proposition that the NOI was insufficient for related but distinct claims. In <u>Levin Enterprises, Inc.</u>, the notice letter indicated that defendants' vehicle maintenance and equipment cleaning operations and their equipment were sources of pollution. <u>Id</u>. The court held that the letter did not provide sufficient notice for a claim that discharges from permit-covered activities (the vehicle maintenance and equipment cleaning identified in the notice) commingled with other activities that did not require a permit (the bulk handling and storage of pollutants). <u>Id</u>. at 1233. But the letter was sufficient to put defendants on notice of the new argument that discharges of dust from defendants' equipment were unlawful discharges from point sources. The letter identified the source of the pollutants (the equipment) and stated that the vehicles raised dust and tracked pollutants off-site. <u>Id</u>. at 1231, 1236. Plaintiffs' claims relating to the slowing and obstruction of wastewater are more like the latter set of claims in <u>Levin Enterprises, Inc.</u> They are of the same type as those alleged in the NOI. As in <u>Henry Bosma Dairy</u>, "the violations originated from the same source, were of the same nature, and were easily identifiable." <u>Henry Bosma Dairy</u>, 305 F.3d at 953. <u>See also</u> <u>San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.</u>, 81 F. Supp. 3d 847, 858 (N.D. Cal. 2015) (notice stating that defendant discharged MGP waste into the bay and failed to conduct groundwater testing sufficient to allow defendant to take remedial steps even though one alleged point source was not identified). A plaintiff "is not required to list every specific aspect or detail of every alleged violation." <u>Id</u>. at 951 (quoting <u>Pub. Interest Research Grp. of New Jersey, Inc. v. Hercules, Inc.</u>, 50 F.3d 1239, 1248 (3d Cir. 1995)). The NOI contained sufficient information to permit Defendants to identify the alleged violations. The court has subject matter jurisdiction over these allegations.[8]

---

[8] The parties dispute, and the SAC does not indicate, whether the berms were constructed after the NOI was sent. The NOI provided Defendants with sufficient notice of the endangerment alleged in the SAC regardless of when the berms were constructed. <u>See</u> <u>Nat. Res. Def. Council v. Southwest Marine, Inc.</u>, 236 F.3d 985 (9th Cir. 2000); <u>AG Industrial,</u>

19

But the NOI failed to place Defendants on notice of Plaintiffs' claims relating to waste dispersed by wind. These allegations relate to a different kind of violation. The SAC alleges that Defendants transport waste from the canyon collector detention basins using bulldozers and other equipment and "discharge, deposit, dump, spill, or otherwise place that waste elsewhere in the Tijuana River Valley such that it may enter the environment, including the air and water." (SAC ¶ 67.) The dried and waste-laden sediment is then "mobilized by wind and vehicular traffic, creating inhalation exposure and re-deposition of dust on vegetation that may subsequently be consumed by wildlife." (SAC ¶ 102.) Waste is also dispersed by wind when water evaporates from the canyon collectors and flood control conveyance, leaving behind dried waste. (Id.) The waste is then picked up and dispersed by wind. (Id.) The NOI makes no mention of the movement of waste by bulldozer, shovel, or other equipment. Nor does it mention the mobilization of waste by wind. Unlike Plaintiffs' allegations relating to the discharge of wastewater from the flood control conveyance and canyon collectors, Defendants did not have sufficient notice that their activities resulted in the dispersal of waste by wind. The court does not have jurisdiction over these claims.

## B. Plaintiffs State a RCRA Claim

Defendants argue that the SAC fails to allege a RCRA claim as it does not allege that Defendants "contributed" to the handling, storage, treatment, transportation, or disposal of waste. The court disagrees.

"In a RCRA endangerment citizen suit like this one, the plaintiff must show: (1) the defendant is 'any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, (2) who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or

_____

375 F.3d at 920 (plaintiff "was not required to send a second notice letter in order to pursue specific claims regarding the inadequacies of AG Industrial's post-notice compliance efforts").

disposal of any solid or hazardous waste (3) which may present an imminent and substantial endangerment to health or the environment." Ecological Rights Found. v. Pac. Gas & Elec. Co., 874 F.3d 1083, 1100 (9th Cir. 2017) (quoting 42 U.S.C. § 6972(a)(1)(B)). The second "contribution" prong is at issue here.

The Ninth Circuit has held that "contribution" requires "a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA." Hinds Investments, L.P. v. Angioli, 654 F.3d 846, 851 (9th Cir. 2011). Accord Ecological Rights Found., 874 F.3d at 1100.[9] "Congress intended that the term 'contribution' be 'liberally construed,' and such term includes 'a share in any act or effect' giving rise to disposal of the wastes that may present an endangerment." Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC, 80 F. Supp. 3d 1180, 1229 (E.D. Wash. 2015) (quoting United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1383-84 (8th

---

[9] Plaintiffs argue that under Hinds, *any* handling, storage, treatment, transportation, or disposal of waste is per se "active involvement" with the waste. (Doc. No. 37 at 21-22.) Plaintiffs focus on the court's statement that "[h]andling the waste, storing it, treating it, transporting it, and disposing of it are all active functions with a direct connection to the waste itself." Hinds, 654 F.3d at 851. Plaintiffs' reading of Hinds shifts the "contribution" analysis to definition of the terms handling, storage, treatment, transportation, and disposal. But Hinds limits liability to "active involvement" with or "control over" the waste, in light of the "contribution" language of § 6972(a)(1)(B). In other words, a defendant is only liable if they "contribute" to the handling, storage, treatment, transportation, or disposal of waste. Id. at 850. A defendant only "contributes" if he or she is "actively involved in or ha[s] some degree of control over the waste disposal process." Id. at 851. "By definition, the phrase 'has contributed or is contributing' requires affirmative action." Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d 847, 854 (7th Cir. 2008). "[O]nce the active component of 'contribution' has been established, the 'handling, storage, treatment, transportation, or disposal' component of the claim presents a separate requirement subject to a different analysis." Goldfarb v. Mayor & City Council of Baltimore, 791 F.3d 500, 516 n.10 (4th Cir. 2015). See also Ecological Rights Found. v. Pac. Gas & Elec. Co., 803 F. Supp. 2d 1056, 1065 (N.D. Cal. 2011), aff'd, 713 F.3d 502 (9th Cir. 2013) ("[T]he Sycamore court's determination that 'has contributed or is contributing' requires affirmative action,' applies with equal force to the expressly-stated activities, such as 'disposal.'") (internal citation omitted).

21

Cir. 1989)).  But to "contribute," a defendant must have a sufficiently direct connection to the waste disposal process.  California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d 930, 979 (E.D. Cal. 2003).  A defendant's "'contribution' must be causally connected to the possibility of an 'imminent and substantial endangerment.'"  Id.  For example, the design and manufacture of machines that will ultimately produce waste, Hinds, 654 F.3d 846, and the mere ownership of contaminated land, see, e.g., First San Diego Properties v. Exxon Co., 859 F. Supp. 1313 (S.D. Cal. 1994), are insufficient for contribution under RCRA.

The court previously dismissed Plaintiffs' allegations that Defendants contribute to the waste disposal process when wastewater flows through the flood control conveyance and canyon collectors and into the Tijuana River Valley.  At best, the court held, these allegations involved the mere passive transport of wastewater from the border to the Tijuana River Valley.  (Doc. No. 26 at 20.)  The FAC alleged that the structure of the flood control conveyance "merely permit[s] the waste from Mexico to flow through the system." (Id.)  Thus, Plaintiffs failed to allege that USIBWC played an active role with a sufficiently direct connection to the waste.  (Id.)  Similarly, the FAC's allegations relating to the flow of water through the canyon collectors that is not diverted into one of the drains for treatment at the South Bay Plant failed to allege that Defendants played an active role with a direct connection to the waste.  (Id. at 20-21.)  "Wastewater that is not detained by the canyon collectors, like the wastewater that is never detained in the flood control conveyance, would flow into the Tijuana River Valley and make its way to the Pacific Ocean regardless of Defendants' actions."  (Id. at 21.)  This theory of liability—wastewater passively flowing from the border through Defendants' facilities and into the Tijuana River Valley unchanged—remains insufficient for RCRA liability.

18cv457 JM (JMA)

In addition to these allegations, however, the SAC alleges a new theory of liability.[10] Plaintiffs allege that the design of the canyon collector detention basins and flood control conveyance, and the construction of a berm in the flood control conveyance, change the quality and character of the waste flowing across the border from Mexico. Plaintiffs allege that Defendants are aware that the flood control conveyance and canyon collectors almost always contain pollutants and waste. (SAC ¶ 70.) The flood control conveyance "collects and concentrates pollutants in runoff that might otherwise not be traceable to an identifiable source of discharge." (SAC ¶ 72.) A portion of the flood control conveyance was intentionally designed to slow the flow of water before it exits the conveyance into the New Tijuana River. (SAC ¶ 60.) USIBWC also constructed a temporary berm in the flood control conveyance using waste-laden sediment and other materials deposited in the conveyance. (SAC ¶ 63.) The berm is intended to reduce the volume of water flowing across the border from Mexico by redirecting the water south into the CILA diversion in Mexico. (Id.) But it also temporarily detains wastewater in the flood control conveyance. (SAC ¶ 102.) Plaintiffs allege that the design of the canyon collector detention basins temporarily detain wastewater. Defendants bulldoze, shovel, and otherwise move the waste-laden sediment in the canyon collector basins to create temporary berms inside the detention basins and along the canyon collector rims. (SAC ¶¶ 83, 84.) The berms are intended to direct and contain flows entering and moving through the canyon collectors. (SAC ¶ 84.) Wastewater pools in the canyon collector detention basins when the drain inlets leading to the South Bay Plant system are not open or are blocked. (SAC ¶ 66.)

The SAC describes the detained wastewater in the flood control conveyance and canyon collectors as "open toxic waste pits." (SAC ¶ 102.) Slowed and temporarily detained water in the flood control conveyance and canyon collector detention basins create

---

[10] As discussed above, the court does not have jurisdiction over Plaintiffs' claim that Defendants remove waste from the detention basins using bulldozers and other equipment and dump or stockpile the waste elsewhere, or the claim that waste is mobilized and dispersed by wind.

an "enhanced physiochemical environment that allows much greater pathogen survival and growth," increasing pathogen concentrations. (Id.) It also "creates more favorable environments for pathogen vectors, particularly mosquitos and flies." (Id.) When water flow increases, waste with higher concentrations of pathogens and contaminants is flushed into the Tijuana River Valley. (Id.) High flows of water into the flood control conveyance cause the concentrated "slug flows" to discharge into the New Tijuana River. (SAC ¶ 63, 102.) An influent of water into the canyon collector basins causes the waste to overflow from the basins and travel toward the Tijuana River Valley. (SAC ¶¶ 67, 102.) These flows contain higher concentrations of contaminants and pathogens. (SAC ¶ 102.) Sediment from the flood control conveyance and canyon collectors is more likely to contain contaminants such as carcinogenic compounds, DDT, dioxins, furans, heavy metals, and Poly Nuclear Aromatics. (Id.) As a result, flows of waste exiting the flood control conveyance and canyon collectors after detention are more likely to harm humans and the environment. (Id.)

Unlike the allegations the court previously dismissed, the SAC alleges that Defendants' actions change the quality and character of waste. As a result of Defendants' construction of sediment berms and the design of the canyon collectors and flood control conveyance, the highly concentrated waste that exits Defendants' facilities is different than the waste that flowed across the border. This waste presents an increased risk of endangerment to human health and the environment. Defendants argue that Plaintiffs' allegations are implausible, disingenuous, and the remedy to the alleged harm caused by the berms would be to remove them, resulting in more waste flowing freely into the Tijuana River Valley instead of the CILA diversion. (Doc. No. 33-1 at 22.) At the motion to dismiss stage, the court must accept all well-pled, plausible factual allegations as true. Iqbal, 556 U.S. at 678-79. Plaintiffs' allegations are not implausible. The accumulation and stagnation of contaminants may result in the growth of pathogens and higher concentrations of contaminants. Plaintiffs sufficiently allege that Defendants are actively involved in the handling and storage of waste when they construct sediment berms, detain

waste in the canyon collector basins, and slow and halt wastewater flows in the flood control conveyance.

For the reasons discussed above, Defendants' motions to dismiss Plaintiffs' RCRA claim are granted in part and denied in part.

## CONCLUSION

USIBWC's motion to dismiss on sovereign immunity grounds is denied. Defendants' motions to dismiss Plaintiffs' RCRA claim under Rule 12(b)(1) are granted in part and denied in part. Plaintiffs' allegations relating to the dispersal of waste by wind are dismissed as the court lacks jurisdiction over these allegations. The court has jurisdiction over the remainder of Plaintiffs' RCRA claim. Defendants' motions to dismiss Plaintiffs' RCRA claim pursuant to Rule 12(b)(6) are granted in part and denied in part. Plaintiffs state a claim for violation of RCRA under Rule 12(b)(6), but only as to the allegations that Defendants' temporary slowing and obstruction of wastewater changes the character of the waste flowing from Mexico and exacerbates environmental and human endangerment.

IT IS SO ORDERED

DATED: December 11, 2018

JEFFREY T. MILLER
United States District Judge