1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   CITY OF IMPERIAL BEACH,   a        )
    municipal corporation, et al.,     )
4                                      )   No. 3:18-CV-00457-JM-LL
            Plaintiffs,                )
5                                      )
    v.                                 )   November 19, 2018
6                                      )
    THE INTERNATIONAL BOUNDARY &       )
7   WATER COMMISSION - UNITED STATES   )
    SECTION, an agency of the United   )
8   States, et al.,                    )
                                       )   Courtroom 5D
9           Defendants.                )
    _____   )   San Diego, California
10

11                  TRANSCRIPT OF PROCEEDINGS

12                      (Oral Argument)

13

14     BEFORE THE HONORABLE JEFFREY T. MILLER, DISTRICT JUDGE

15

16

17

18

19

20

21

22   COURT REPORTER:          AMANDA M. LeGORE
                              RDR, CRR, CRC, FCRR, CACSR
23                            U.S. District Court
                              333 West Broadway, Suite 420
24                            San Diego, CA 92101
                              amanda_legore@casd.uscourts.gov
25

```
1    APPEARANCES:

2    FOR PLAINTIFF CITY OF
     IMPERIAL BEACH, et al.:   MATTHEW EDLING
3                              Sher Edling, LLP
                               100 Montgomery Street, Suite 1410
4                              San Francisco, CA  94104
                               (628)231-2500
5

6    FOR PLAINTIFF SAN DIEGO
     UNIFIED PORT DISTRICT:    JOHN CARTER
7                              San Diego Unified Port District
                               Office of the Port Attorney
8                              3165 Pacific Highway
                               San Diego, CA  92101
9                              (619)686-6219

10

11   FOR THE DEFENDANT
     UNITED STATES:            ANDREW COGHLAN
12                             Environmental Defense Section
                               U.S. Department of Justice
13                             PO Box 7611
                               Washington, D.C.  20044
14                             (202)514-9275

15

16                             DEBRA CARFORA
                               U.S. Department of Justice
17                             Environment & Natural Resources Div.
                               601 D Street NW_Washington, DC  20004
18                             (202)514-2640

19
     FOR DEFENDANT VEOLIA:     THOMAS BIENERT
20                             ANNE UYEDA
                               Bienert, Miller & Katzman, PLC
21                             903 Calle Amanecer, Suite 350
                               San Clemente, CA  92673
22                             (949)369-3700

23

24

25
```

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3  SURFRIDER FOUNDATION, a            )
   California nonprofit corporation,  )
4                                     )   No. 3:18-CV-01621-JM-LL
              Plaintiff,              )
5                                     )
   v.                                 )   November 19, 2018
6                                     )
   THE INTERNATIONAL BOUNDARY &       )
7  WATER COMMISSION - UNITED STATES   )
   SECTION, an agency of the United   )
8  States, et al.,                    )
                                      )   Courtroom 5D
9            Defendant.               )
   _____)   San Diego, California

10

11              TRANSCRIPT OF PROCEEDINGS

12                 (Oral Argument)

13

14     BEFORE THE HONORABLE JEFFREY T. MILLER, DISTRICT JUDGE

15

16

17

18

19

20

21

22  COURT REPORTER:        AMANDA M. LeGORE
                           RDR, CRR, CRC, FCRR, CACSR
23                         U.S. District Court
                           333 West Broadway, Suite 420
24                         San Diego, CA 92101
                           amanda_legore@casd.uscourts.gov
25

```
 1   APPEARANCES:

 2   FOR PLAINTIFF
     SURFRIDER:                  MARGARET WARNER
 3                               JIAXIAO ZHANG
                                 ANGELA HOWE
 4                               McDermott, Will & Emery
                                 500 North Capitol Street, NW
 5                               Washington, DC 20001
                                 (202)756-8228
 6

 7

 8   FOR THE DEFENDANT
     UNITED STATES:              ANDREW COGHLAN
 9                               Environmental Defense Section
                                 U.S. Department of Justice
10                               PO Box 7611
                                 Washington, D.C.  20044
11                               (202)514-9275

12
                                 DEBRA CARFORA
13                               U.S. Department of Justice
                                 Environment & Natural Resources Div.
14                               601 D Street NW_Washington, DC  20004
                                 (202)514-2640
15

16

17

18

19

20

21

22

23

24

25
```

1          (Monday, November 19, 2018; 9:00 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  Good morning, everyone.  Please be

6  seated.

7          THE ATTORNEYS:  Good morning, your Honor.

8          THE CLERK:  Nos. 1 and 2 on calendar.  Case No.

9  18-CV-0457, City of Imperial Beach versus The International

10 Boundary and Water Commission.  And Case No. 18-CV-1621,

11 Surfrider Foundation v. The International Boundary and Water

12 Commission, on for motion hearing.

13         THE COURT:  Okay.  Counsel, would you state your

14 appearances, please.

15         Why don't we start off in City of Imperial Beach.

16 Who do we have here?

17         MR. EDLING:  Good morning, your Honor.  Matt Edling

18 and John Carter on behalf of the plaintiffs.

19         THE COURT:  Okay.  Thank you.

20         And for Surfrider?

21         MS. WARNER:  Good morning, your Honor.  Peg Warner,

22 McDermott Will & Emery, along with Ms. Zhang and Ms. Ruth

23 [sic], for Surfrider Foundation.

24         THE COURT:  Okay.  Who will be arguing -- let me --

25 let me hear from the defendants, before you let me know who's

1    actually going to be arguing.

2            MR. COGHLAN:  Good morning, your Honor.  Andrew

3    Coghlan for the United States.

4            MS. CARFORA:  Deborah Carfora for the United States.

5            MR. BIENERT:  Good morning, your Honor.  Thomas

6    Bienert and Anne Uyeda for Veolia North America.  And I will be

7    arguing, your Honor, for Veolia.

8            THE COURT:  Okay.  All right.  Let's start with the

9    moving parties here.

10           These are 12(b)(6) motions filed in -- in both

11   actions.  So I think perhaps the best way to proceed would be

12   to have -- would be to have the moving parties argue.  And then

13   we'll give City of Imperial Beach, et al., and then Surfrider

14   an opportunity to respond.  All right?

15           MR. COGHLAN:  Okay, your Honor.  If it's okay with

16   the Court, I'll go first for the United States.

17           THE COURT:  It sure is.  Yeah.  Why don't you step to

18   the lectern.

19           Mr. Coghlan?

20           MR. COGHLAN:  Yes, sir.

21           THE COURT:  Um-hmm, please.

22           MR. COGHLAN:  I would like to begin, if I could, with

23   the claim that the flood control structure violates the Clean

24   Water Act.  And that claim fails because, on its plain terms,

25   the Clean Water Act cannot be applied to impair or affect the

1  provisions of the treaty.

2          And on the unusual facts of this case, the

3  application of the Clean Water Act urged by plaintiffs would do

4  exactly that.  And it would do just that for three related

5  reasons.

6          The first one is the movement of pollutants through

7  the flood control structure is fundamentally an international

8  problem.

9          Second, the United States and Mexico have agreed to

10  address international pollution problems through a bilateral

11  diplomatic negotiation process.

12          And, third, the application of the Clean Water Act

13  urged by plaintiffs would necessarily impair or affect the

14  provisions of those treaty arrangements by imposing on the

15  United States Government an open-ended obligation to assume

16  control over water quality in the Tijuana River.

17          And the first of those reasons is fairly

18  straightforward, your Honor.  The Tijuana River is an

19  international river.  It flows through the Mexican city of

20  Tijuana before crossing the border and entering the flood

21  control structure.

22          That structure is just a simple concrete channel.  It

23  does not generate any pollutants.  And so any pollutants that

24  are in the flood control structure necessarily originate

25  upstream in Mexico.

 1           To say, as plaintiffs do now, that the movement of

 2    pollutants in the flood control structure is a purely domestic

 3    problem with no international dimension just ignores the plain

 4    facts of this case.  We're dealing with pollution that

 5    originates in Mexico and flows into the United States.  That is

 6    an international pollution problem.

 7           Which brings me to my second point, which is that the

 8    United States Government and the Government of Mexico have

 9    agreed to resolve international pollution problems through a

10    bilateral negotiation process.

11           Article III of the 1944 treaty commits both

12    governments to address border sanitation problems through the

13    implementation of measures and works that are mutually agreed

14    upon.

15           Minute 261 refines that commitment by requiring the

16    United States and Mexico to jointly assess the causes and the

17    potential solution to the border sanitation problems, and then

18    to memorialize the agreed-upon courses of action in the treaty

19    minute.  Over the years, the United States and Mexico, through

20    the treaty minute process --

21           THE COURT:  Isn't -- isn't the basic issue here

22    whether or not Congress unequivocally consented to suit under

23    the -- under the Clean Water Act?

24           MR. COGHLAN:  That is a component of the issue here,

25    your Honor.

1              What -- what's clear here is that Congress said that

2    the Clean Water Act cannot --

3              THE COURT:  Any citizen can sue, basically, under the

4    Clean Water Act, and that includes suing the United States

5    Government, unless sovereign immunity attaches.  And sovereign

6    immunity may not attach unless, in this case, the -- the action

7    would affect or impair the provisions of -- of a treaty.

8              And -- and you're taking the position, here, that

9    somehow this will affect the -- the treaty, the 1944 treaty.

10   That's your -- that's your fundamental decision.  And as part

11   of your argument, you're -- you're positing the theory that

12   this will affect the negotiation position of the United States

13   vis-a-vis Mexico.

14             MR. COGHLAN:  (Nods head.)

15             THE COURT:  These are -- these are conclusions.

16   They're conclusory allegations.  How do we know that?

17             MR. COGHLAN:  We know that, your Honor, for several

18   reasons.  The first is what would happen if the flood control

19   structure was subject to Clean Water Act requirements.

20             So plaintiffs have argued that the flow of water

21   through the flood control structure into unimproved structures

22   of the Tijuana River violates sections of the Clean Water Act

23   because it is not made with a NPDES permit.  If the NPDES

24   permit were imposed on the flood control structure, then by

25   operation of law, USIBWC would be responsible for ensuring the

1    quality of water that passes across the border into the flood

2    control structure and then out of the flood control structure.

3    That's not conjectural.  That is not hypothetical.  That is

4    just what a NPDES permit would do.

5            The effect is that the United States Government would

6    have an open-ended legal obligation to ensure water quality of

7    the Tijuana River.

8            Now, that's not something that the United States

9    Government has agreed to do through bilateral negotiation

10   process with Mexico.  Any bilateral negotiation with -- process

11   with Mexico to address the flow of pollutants across the border

12   from Mexico into the United States would effectively be

13   pre-figured by the application of the Clean Water Act.  So it's

14   not to say that the United States Government does not have the

15   authority, necessarily, to address pollutants inside the

16   borders of the United States.  It's that the Clean Water Act,

17   by its plain terms, can't be used to compel the United States

18   to assume that open-ended obligation, bypassing the diplomatic

19   process that the treaty specifically provides in order to

20   resolve these problems jointly with Mexico.

21           Now, the United States Government and the Government

22   of Mexico, over the years, have used that process of bilateral

23   negotiation, that treaty minute process to undertake a variety

24   of measures in the Tijuana/San Diego region to address the

25   evolving problem of transboundary flows in the region.

1    And if you look at those past treaty minutes, what

2  you'll see is that in every instance -- almost every instance,

3  I should say, those treaty minutes reflect a commitment by the

4  Government of Mexico to assume responsibility for pollution

5  that originates in Mexico by constructing new or upgrading

6  existing works in the city of Tijuana.  And the exception to

7  that, of course, is the South Bay international water treatment

8  plant and the associated canyon collectors.

9    The United States Government agreed to construct

10  those works in San Diego for the purposes of treating 25

11  million gallons a day of Tijuana's wastewater.

12    THE COURT:  What about -- what about the construction

13  of the berm that allows for diversion of waste material to

14  the -- the CILA diversionary features.  Aren't those in Mexico?

15  Aren't those south of the border?

16    MR. COGHLAN:  Well, the United States Government

17  agreed, in consultation with Mexico, to build a temporary berm

18  in the flood control structure for the purposes of diverting

19  limited quantities --

20    THE COURT:  But that's south -- that's south of

21  Mexico.  Excuse me, south of the border.

22    MR. COGHLAN:  No, your Honor.  The berm itself is in

23  the United States.  The water that it prevents from entering

24  any further into the United States is approximately right at

25  the border.  So it prevents water from moving through the flood

1   control structure into downstream reaches of the water.

2          THE COURT:  On which side -- on which side of the

3   border is it?  The U.S. side or the Mexican side?  This

4   so-called berm that diverts water to the CILA diversion?

5          MR. COGHLAN:  I believe it is just inside the border,

6   on the U.S. side, your Honor.

7          THE COURT:  Just inside the border?

8          MR. COGHLAN:  Yes, yes.

9          THE COURT:  Okay.

10         MR. COGHLAN:  But what that does is it diverts a

11  limited quantity of dry-weather flow to the CILA diversion

12  structure.  It diverts a limited quantity of water from

13  crossing the border, into the -- in -- diverts it into the CILA

14  diversion structure.

15         That's different in kind to what the NPDES permit

16  would do.  The NPDES permit would impose on the United States

17  responsibility for assuring the flow of any water -- wet

18  weather or dry weather -- that flowed through the flood control

19  structure.

20         That's a much greater obligation.  This is not a

21  question of just creating a temporary berm in there for

22  addressing all pollution problems.  This is an opened-ended

23  obligation to assure the water quality of all waters that flow

24  in wet water or dry, through the --

25         THE COURT:  Wouldn't your argument also apply to the

1  permit that was required for the canyon collectors?  Why didn't

2  that -- why didn't that basically suffer from the same negative

3  potential that it affected the negotiation position between the

4  countries?

5        MR. COGHLAN:  Well, I make two points in response to

6  that, your Honor.  The first is that the question on the second

7  claim with respect to the canyon collectors is what the NPDES

8  permit that indisputably governs -- to some extent -- the

9  operation that those canyon collectors actually requires.  Now,

10  we have an ambiguous permit --

11        THE COURT:  Well, let me stop you there then.

12  Couldn't we make the same argument with respect to any permit

13  that might be required with respect to the channel?  It would

14  depend upon what the permit required.  And to the extent the

15  permit would require something that wasn't a -- a -- a

16  categorical and false remediation of -- of the entire issue, it

17  would still allow the two countries to -- to negotiate.

18        MR. COGHLAN:  Well, you're anticipating my second

19  point, your Honor, which is that the canyon collectors in the

20  South Bay treatment plant, that those collectors are pertinent

21  to, were created for the express purpose of treating, to

22  secondary standards, 25 million gallons of Tijuana's

23  wastewater.

24        The NPDES permit that governs the international water

25  treatment plan requires it to treat, to secondary standards, 25

1    million gallons a day of Tijuana's wastewater.

2           THE COURT:  You're speaking rather quickly.

3           MR. COGHLAN:  I'm sorry.

4           THE COURT:  But let me -- let me have you back up.

5    You're not saying that the canyon collectors were built for the

6    purpose of basically handling up to 25 million gallons of

7    wastewater a day, were you?

8           MR. COGHLAN:  No, I'm not, your Honor.  What I'm

9    saying is that the canyon collectors are pertinent to the plan

10   and are designed to move a limited quantity of --

11          THE COURT:  Yeah, very small.  It would just be a

12   tiny fraction of the 25 million gallons a day?

13          MR. COGHLAN:  Exactly.  Exactly, your Honor.  And so

14   the requirements of the NPDES permit don't impose on the canyon

15   collectors and the wastewater treatment plant in a function

16   that was never contemplated for those -- for the imposition of

17   a NPDES permit requirement.  But the flood control structure

18   would.  The flood control structure has no border sanitation

19   application whatsoever.  It was just designed to prevent floods

20   from damaging property on both sides of the border.  And

21   that's -- that's all it does.

22          The imposition of the NPDES permit, in that case,

23   would enlarge that function into something that was never

24   contemplated when the two governments agreed to jointly

25   construct that flood control structure.  I think that's the key

1   difference between these two issues.

2            THE COURT:  Okay.

3            MR. COGHLAN:  I think it's -- it's instructive to

4   look at the process that the United States went through before

5   agreeing to build the international water treatment plant and

6   the canyon collectors.  The agreement, in principle, to

7   construct those works was announced at a meeting between the

8   President of the United States and the President of Mexico.  It

9   was preceded by several years of careful study by USIBWC and

10  its Mexican counterpart CILA.

11            And the minute that provides for the construction of

12  those works was approved by the American Secretary of State and

13  the Mexican foreign relations minister.  And by my count, at

14  least, it took three acts of Congress to actually get the plan

15  built.  So the assumption by the United States Government of

16  responsibility over a limited, finite quantity of Tijuana's

17  wastewater was a foreign policy decision that was informed by

18  engineering study and bilateral negotiation and expressly

19  endorsed by act of Congress.  Which is precisely what the

20  treaty contemplates.  And that's the process that plaintiffs

21  urged application of the Clean Water Act would completely

22  by-pass.

23            If the flood control structure is subject to NPDES

24  permitting requirements, it would require USIBWC to guarantee

25  water quality inside the flood control structure.

1          Now, Mexico might agree to build some works within

2     its border, upgrade some works in its borders through process

3     of negotiation.  But the ultimate outcome of any such

4     negotiation is in many ways pre-figured.  The United States

5     Government is the entity that's left ultimately holding the

6     bag.  The buck would stop with the United States Government.

7     That's the rub.

8          I mean, the United States Government has the legal

9     authority potentially to do all of those things.  It's not that

10    the United States Government would never do those things.  It's

11    that Congress will not allow the Clean Water Act -- or has

12    precluded the Clean Water Act's application to require the

13    United States Government to do those things without going

14    through the treaty process.

15         I would just add, your Honor, with respect to the

16    RCRA claims raised by the City of Imperial Beach plaintiffs, we

17    don't have a lot to add.  We think the Court properly decided

18    those claims in the first instance.  The only new factual

19    allegations were not mentioned anywhere in the NOI letter, and

20    we think that those claims should be dismissed.

21         Again, I'm happy to answer any questions about those

22    RCRA claims.

23         THE COURT:  Was that your primary position -- your --

24    your most important defense here, that the new allegations were

25    not set forth in the letter and -- and, therefore, the Court

1   doesn't need to deal with it?

2           MR. COGHLAN:  That is our primary position, your

3   Honor.

4           THE COURT:  What is your fallback position?

5           MR. COGHLAN:  The fallback position, your Honor, is

6   that those allegations, the new allegations, the allegations

7   that by creating berms to divert the flow of water into the

8   CILA diversion structure, into the drains of the canyon

9   collectors, that that somehow creates a heightened problem in

10  Tijuana River valley is implausible on its face.  That would be

11  our fallback position, your Honor.  But we don't think the

12  Court needs to reach that because we think the lack of notice

13  in the NOI letter --

14          THE COURT:  What if I do need to reach it?

15          MR. COGHLAN:  Your Honor, I think --

16          THE COURT:  What if there was substantial compliance

17  with the -- with the requirement that a notice letter -- the --

18  the notice letter that was -- that was filed in this case, that

19  was presented in this case covers the -- the new allegations

20  because they're so intertwined with the original allegations

21  that they reasonably put your -- your client on notice?

22          MR. COGHLAN:  Well, your Honor, accepting that

23  premise without conceding it, I would say that the allegations,

24  here, deal with harm that results from the flow of water into

25  Mexico, into the Tijuana River valley.  Staunching the flow of

1   that water does not result in harm.  I think that the

2   allegation that USIBWC somehow harms the Tijuana River valley

3   by preventing pollutants from freely flowing into it is

4   implausible on its face, and I don't know what else to say

5   about that.

6          THE COURT:  Well, your position is that, as you put

7   it, staunching the water or creating these slug (phonetic)

8   flows, as has been alleged in the second amended complaint and

9   the specific by the City of Imperial Beach, is of no moment

10  because it doesn't do anything to -- to change the -- the

11  character of the pollution or the harm to the environment.  Is

12  that basically your position?

13         MR. COGHLAN:  Our position is that staunching those

14  flows, preventing them from entering the United States by

15  redirecting them into the CILA diversion structure, which

16  plaintiffs have acknowledged is what the berm does, redirecting

17  them into the canyon collectors, which is what in fact those

18  berms do, does not increase harm.  In fact, decreases harm in

19  the United States because it prevents water that would have

20  otherwise reached from flowing in.

21         THE COURT:  Well, I think the question I have

22  ultimately for both sides is -- is -- is this the kind of

23  allegation that requires some discovery?

24         Some -- some -- some factual development of the

25  record here to determine whether or not this -- this

1    allegation -- if -- if it is a well-pled theory of -- of

2    pollution or contribution under RCRA, actually has -- has

3    support -- evidentiary support, ultimately.  You're saying,

4    well, it's the same thing.  And it's -- it's -- the Court can

5    just dismiss it because it's not the case.  How can that be the

6    case?

7            And then the other side of the case is saying, wait a

8    minute now.  Now we're dealing with -- with -- with

9    concentrated polluted material, which in heavy flow periods

10   may -- may be released in -- where the -- the character --

11   essentially where the character of the polluted material has

12   changed, where there's an increased concentration of -- of

13   pathogens and other chemical pollution.  And so that's a --

14   that's a horse of a different color, so to speak.  And that,

15   therefore, that constitutes active involvement or a

16   contribution -- that theory -- that factual theory wasn't

17   before the Court the first time around.

18           I think the -- I think the allegations there are very

19   problematic in terms of adequately pleading under the dictates

20   of *Iqbal* and *Twombly* what's required to be pled.  There seems

21   to be a highly speculative level about it, at least in the

22   existing pleadings.  And I'm saying this, obviously, for both

23   sides here.

24           But if in fact this is a new factual theory of

25   contribution under RCRA which can be buttressed by a -- an

1    evidentiary development of the record here, what -- what --

2    what would be -- what would be your -- your view of that?

3            Do you still think this is something the Court should

4    dismiss at -- at what -- what is the threshold of the case?

5            MR. COGHLAN:  Well, your Honor, I think if -- if you

6    look past the fatal lack of notice here because it is --

7            THE COURT:  Let's assume that.

8            MR. COGHLAN:  Let's assume.

9            THE COURT:  Let's assume that.  You may -- you may

10   have a good position on notice.

11           MR. COGHLAN:  Yeah.

12           THE COURT:  I haven't made a determination there but

13   it's a question in my mind.  So let's assume for a moment that

14   you have a problem with notice.

15           MR. COGHLAN:  So -- so assuming that away and

16   assuming the speculative and implausible nature of the

17   allegations away, I think what we would ask your Honor, if you

18   determine ultimately that this is a fact question that requires

19   some development through discovery, is just that the order make

20   clear what the scope of that discovery is.  That this is an

21   open-ended theory of RCRA liability that is premised on the

22   pure existence of the flood control structure or the pure

23   existence of the canyon collectors.  That it has something to

24   do very specifically with --

25           THE COURT:  Yes, I think I understand your point.

```
1              MR. COGHLAN:  (Nods head.)

2              THE COURT:  In other words, incorporate the analysis

3    in the original order of the Court because nothing has changed

4    with respect to that theory of liability under RCRA?

5              MR. COGHLAN:  Precisely, your Honor.

6              THE COURT:  Okay.  Okay.

7              MR. COGHLAN:  Well, if there are no other questions

8    at this point --

9              THE COURT:  No, no, no.  Thank you for your -- thank

10   you for your argument, though.  I do appreciate it.

11             MR. COGHLAN:  Thank you, your Honor.

12             MR. BIENERT:  Your Honor, may I have a -- on the last

13   point?

14             THE COURT:  I'm sorry?

15             MR. BIENERT:  On behalf of Veolia, may I just touch

16   on the last question you asked?

17             THE COURT:  Well, certainly.  I was going to

18   recognize you and invite you to step to the lectern and make

19   your argument at this time.  Okay?

20             MR. BIENERT:  Yeah.  My apologies.  I saw counsel

21   getting up, and I just wanted to be practical about --

22             THE COURT:  Oh, certainly.

23             MR. BIENERT:  If this was a good dovetail --

24             THE COURT:  I haven't forgotten you.  Maybe counsel

25   did but I --
```

1          (Laughter.)

2          MR. BIENERT:  I'm easily forgotten, your Honor.

3    Thomas Bienert on behalf of Veolia North America.

4          The one thing I would say, that even on the face of

5    what was alleged originally and what was alleged now, on your

6    last point, your Honor, even with the pleading the way it is,

7    there's no causal link and here's why.

8          What the Government's pleading, both it's NOI --

9    setting aside the fact that it doesn't specify the berm slug

10   flow issue.  But just accepting it for purposes of argument as

11   accurate, and the second amended complaint.  What the complaint

12   is is that -- what I'll call these trickle flows.  These

13   nonweather event flows that the canyon collectors address.  The

14   water comes in at a low level.  As much of it as hopefully can

15   be captured goes into the system at IBWC.  And what doesn't go

16   into the system flows at some level down the canyons that we

17   all looked at together.

18         They don't go off to the ocean unless and until there

19   is a significant rain event, and then it's the torrent of water

20   that pushes everything out a lot further.  So with that, right

21   there, that concept, whether or not --

22         THE COURT:  But that's not a complete -- I don't

23   think that's a complete picture of what this new concept is.

24   You're talking about -- about this just in terms of water flow.

25         There are -- there are -- there's another part of

1    the -- of the new factual theory, and that is that -- that the

2    movement of the accumulated materials -- the solid material,

3    now, for want of a better term -- is in and of itself a

4    handling or a -- a transportation of material.  And the

5    material that's being handled or transported is of a different

6    character or quality, posing a different type of threat,

7    airborne threat, and -- and perhaps other threats that I don't

8    think was set forth in the first amended complaint; and seems

9    to be, as I say, a bit of a different factual theory.

10           Would you like to address yourself to that?

11           MR. BIENERT:  Yes, your Honor.  And I'm sort of

12   taking it all in reverse order.  As I see it we have the notice

13   issue.  We have the do we actively -- are we actively involved

14   with it, and then we have the causation.  And simply going to

15   causation and taking what your Honor just pointed out, as I

16   understand their new theory, it's that having these deposits

17   sit there in a pooled condition exacerbates the potential

18   pollutive effects.

19           THE COURT:  That's what the allegation -- well, they

20   don't even go that far.

21           I think their tentative, from my reading of paragraph

22   67 of the second amended complaint, they seem to be using a

23   qualifier or -- or signaling that there's some uncertainty as

24   to whether or not this actually happens.

25           MR. BIENERT:  I think that's right.  But let's take

1   it at full value, whatever we want to say it, conceptually.

2   But that pooling is going to happen with the low flows, whether

3   it happens at the canyon collector or whether it happens at

4   some spot whether it's 100 yards down the canyon or a quarter

5   mile down the canyon.  In other words, the low flows, they

6   don't go all the way to the ocean.  They're going to pool

7   somewhere, if there's enough to pool, in the various top --

8   topographical areas of the canyon.

9           THE COURT:  Okay.

10          MR. BIENERT:  So the point I'm making is therefore

11  there is no causal link in this added because of pooling effect

12  theory of pollution that Veolia or IBWC contributes to.

13  Because if it pools because of the berm trying to push it into

14  the grate or if it pools 100 yards down on the canyon or a

15  quarter mile down, it's the fact that it's sitting there that

16  seems to be their theory that could add to the pollution later.

17  And that's going to happen no matter what because it's the same

18  volume of pollution that comes in --

19          THE COURT:  How do we know that, though?

20          Let me -- let me suggest this.  I don't know if

21  you've been out to any of those canyon collectors.  But if you

22  you go out to -- I believe it's Smuggler's Gulch, and you look

23  at the size of that collector, you're dealing with millions and

24  millions of gallons of material being pooled.  And that -- I

25  think -- may be problematic for your argument.

1          You're seeming to equate smaller pool -- pooling

2    zones downstream in -- in -- in wet events that somehow equate

3    to what is -- what the capacity is of -- of -- of some of these

4    canyon collectors.  I don't know.  I haven't walked the -- you

5    know, the entirety of the natural drainage areas.  But I've

6    seen the photographs.  I've read the capacities of these

7    collectors, and I've actually taken a view of them myself.  And

8    that would -- that would be surprising if there were a-- if

9    there were natural pools within the natural drainage watershed

10   capable of -- at one particular location, accumulating millions

11   of gallons of polluted material.

12          MR. BIENERT:  And I guess, your Honor, were I -- and

13   by the way, I have been out there, your Honor, multiple times,

14   including -- I was kind of in the background of the tour we all

15   did.

16          THE COURT:  The background was a good place to be on

17   that one.

18          (Laughter.)

19          MR. BIENERT:  Yes, your Honor.

20          And maybe a lot of it is just imposing what I saw in

21   terms of my analysis.  You know, the -- the canyon collectors

22   have sort of the cement weirs, which are a structural attempt

23   to kind of make things drain over towards the grates.  But to

24   the degree that there are some earthen berms or earthen little

25   ridges made to try to direct things through more, it was not my

1   understanding, nor is there an allegation that they are

2   sufficient to hold millions of gallons.  I thought they were

3   more directional tools.  So I don't believe there is even an

4   allegation that there is that type of volume that, in essence,

5   makes a directional berm turn into the equivalent of a storage

6   tank.  I just don't believe that's part of the allegation.

7         And what I will say is -- just the discussion we're

8   having, while it makes perfect sense intellectually, I think it

9   does show how speculative everything is getting.  And it brings

10  me back --

11        THE COURT:  That's a good point.  These things are

12  speculative.  And so can they really be resolved on a 12(b)(6)

13  motion?  Should they be resolved on a 12(b)(6) motion?  Or,

14  once again, should there be some development of the record

15  here, the factual record?

16        MR. BIENERT:  What I would at least say, your Honor,

17  is that the plaintiffs have the burden of at least alleging

18  more specificity to get past to where we're actually doing --

19  addressing the full Monte or even a partial discovery of the

20  allegation.

21        In other words, what they have written in was a

22  theory, but a theory isn't proof in a lawsuit.  So I would

23  submit they do need to show more than that.  I would submit

24  that in just looking at the two components, I think that a berm

25  that is aimed at getting more of the sewage into the grates and

1    into the system is not the same as storage.  And I would submit

2    that under the case law, that is certainly dubious as to

3    whether that becomes active involvement.  But, more

4    importantly, I would submit that because logically that same

5    amount of flow is going to wind up going down the canyon and

6    stopping at some point or various points in the canyon before a

7    big rainstorm flushes it out to sea or wherever means we're

8    dealing with the same pollutants and, therefore, the

9    causational element is not met.

10              I would also just like to go back.  The NOI issue, I

11   would just say this, your Honor.  I don't think it's

12   appropriate for you to take the time and effort that this Court

13   and the parties were required to address RCRA when we haven't

14   had the NOI on this berm theory, and here's why.

15              As is clear from the law and then I think as is clear

16   from the gist of the NOI, the purpose of the NOI is to see if

17   the parties can work something out so that we're not sitting

18   here spending time and effort in court over it.

19              When one reads the NOI, what is plain and simply

20   clear from the NOI is, hey, IBWC, hey Veolia, you're not doing

21   enough to capture this wastewater that's coming from Mexico and

22   getting into your system.

23              What they're alleging now, the berm theory, is the

24   exact opposite of that.  We now think that because it looks

25   like you're taking an action to try to do what we really

1    wanted -- if we follow their argument -- to get more of that

2    wastewater into your system -- and we acknowledge once it hits

3    inside of those grates, Veolia is now responsible for it.

4              But we were not controlling the stuff that flows

5    before it gets into the grates.  So what they seem to be saying

6    now, which is a 180-degree reversal, is it looks to us now, on

7    reflection, like you've actually taken affirmative steps to try

8    to get more of the wastewater into your system by building

9    these berms.

10             Well, we don't like those berms because of all of the

11   things your Honor noted, that they cite in their briefing.  We

12   think it creates more air pollutants.  We think can concentrate

13   things.

14             We can have that discussion, your Honor.  Maybe the

15   solution is no berms at all.

16             THE COURT:  Yeah, it -- after a while the position of

17   the plaintiffs becomes counterproductive.  It's almost

18   counterintuitive.  Because extended logically, it's, "Look,

19   just remove everything.  Let's get -- let's get things back --

20   back to the way they were.  And -- and therefore, we're not

21   going to have a problem with pooling and increased

22   concentration of -- of pollutants.  Let's -- let's create an

23   L.A. flood control district situation where these things just

24   move lickety-split right into the natural drainage and

25   watershed areas.

1          And that's not what they want, I mean, you know --

2          MR. BIENERT:  Agreed.

3          THE COURT:  They don't want a reversal of the works

4    that have been done.  So, at some point in time, you know, the

5    theories become almost -- as I say, at the very least,

6    counterintuitive and -- and -- and perhaps very, very

7    inconsistent with what the -- the plaintiffs would really like

8    to see out there.  I understand that argument.  Believe me.  I

9    was -- I was wrestling with that myself a little bit over the

10   weekend.

11         MR. BIENERT:  Well, I would just ask that as to that,

12   if nothing else, based both on the law and, frankly, being

13   practical here.  The appropriate result would be to say let's

14   go back to the NOI table on that issue and you guys give the

15   notice, if that's really where you want to go.  And then the

16   parties have the --

17         THE COURT:  Well, you know, a few minutes ago you

18   raised the specter of the parties trying to work things out,

19   suggesting that this is actually taking place.

20         And I imagine there's been some kind of dialogue

21   over -- over the years, a continuing dialogue.  And the parties

22   are always free to continue those discussions, regardless of

23   whether the -- the initial NOI covers this new theory.  I mean,

24   that shouldn't be any impediment to active and -- and

25   constructive discussions between the parties.

1          MR. BIENERT:  Well, I agree with that, your Honor.

2    But, obviously, I represent a client.  And I would also say

3    that my client shouldn't be subjected to, frankly, what the

4    potential scary outcomes could be in a RCRA case; if in fact

5    the standards for what gets one in front of a RCRA case are

6    even met.  They shouldn't have to pay the fees to do it, and we

7    shouldn't even have that as an element of the case.

8          And what I would posit is that this sort of -- what

9    I'm calling -- narrow issue, are we really making the problem

10   worse by using berms to try to get more of the sewage in or are

11   we making it better, is certainly a significant one.

12         And I would just submit that Veolia -- we're here on

13   the Clean Act portion.  You've already made that ruling, and we

14   understand that.  But I don't believe we should be defending a

15   RCRA claim unless and until that's been filed.  And on that

16   basis --

17         THE COURT:  Well, the theory is, too, that part of --

18   part of what's been done here, of which the plaintiffs are

19   complaining, was done after -- after the -- the initial NOI.

20         MR. BIENERT:  Well, first of all, as we point out,

21   there's no support for that.  But let's accept it as true for

22   purpose of argument.  It doesn't change the standards.  If what

23   they're saying is you've now done a new thing that is causing

24   new pollution, gee, No. 1, it doesn't mean that they don't have

25   to give us an NOI on that.  It's a new violation.

1           And, two -- I mean, to be honest with you, your

2   Honor, I think -- it's funny.  One of the cases cited involved

3   this coke that would blow in the wind.  One of the cases cited

4   by the parties, and one of the points is should they put tarps

5   over it.  I mean, to be honest, your Honor, rather than

6   spending the time and effort that would be entailed in

7   addressing these RCRA violations for creating berms, I think it

8   would be good for the parties to sit down and decide, do you

9   want us to get rid of this all together?  Should we quit the

10  berms?  Should we take a tarp and put it down with big rocks on

11  either end of it?  That's a much better solution than paying

12  all of us and taking your Honor's time to be arguing this RCRA

13  claim of whether the berms are or aren't a good idea.

14          So I would submit that both the law and practicality

15  requires that we go down that road before we are sitting here

16  arguing with your Honor about RCRA as it relates to the canyon

17  collectors.

18          It's a big ticket item.  It could be a stand-alone

19  lawsuit in and of itself.  There will be millions of dollars

20  and hundreds and probably thousands of attorney hours and

21  expert hours on this issue.

22          We should have a right to go through the required

23  jurisdictional NOI before we even address it.

24          THE COURT:  Okay.

25          MR. BIENERT:  Thank you, your Honor.

1                    THE COURT:  Um-hmm.

2                    MS. WARNER:  May it please the Court, I'm Peg Warner,

3      McDermott, Will & Emery, for Surfrider Foundation.  Your

4      Honor --

5                    THE COURT:  I thought we were going to hear from City

6      of Imperial Beach.  That's okay.

7                    MS. WARNER:  I'm sorry, sir.  For efficiency's sake,

8      we divided the argument to try to help with the Court's time.

9                    THE COURT:  Sure.

10                   MS. WARNER:  I will be presenting the argument with

11     regard to sovereign immunity and the 12(b)(1) and treaty

12     issues.

13                   Mr. Edling, who's counsel for the IB parties, will

14     follow with any noncumulative points in that regard and address

15     the RCRA argument.

16                   THE COURT:  Okay.

17                   MS. WARNER:  Your Honor, procedure matters.  The

18     United States filed a 12(b)(1) motion to dismiss.  They did not

19     file a 12(b)(6) motion.  They slipped in 12(b)(6) in their

20     reply.  That's not proper.  But, regardless, it's clear that a

21     claim has been properly stated under 12(b)(6) in the Surfrider

22     case with regard to the Clean Water Act.  12(b)(1) was the

23     basis for their motion to dismiss.

24                   The Government does not truly address the

25     unassailable point that jurisdictional dismissals under

1    12(b)(1) for facial attacks on federal question jurisdiction

2    are exceptional.

3         There is no case that has dismissed a 12(b)(1) facial

4    attack in the circumstances presented in the Surfrider and IB

5    cases.

6         The Government made a string cite in footnote 1 of

7    its reply.  Each one of those cases, your Honor, involved a

8    standard other than 12(b)(1) facial attack.

9         *In Re Missouri River* was a 12(b)(6) dismissal that

10   involved implied conflict waiver under the federal facilities

11   provision of the Clean Water Act.

12        The *Florida Wildlife* case, there was a record which

13   had evidence of the effect of the United States Army Corps'

14   actions.  The plaintiffs in that case, your Honor, accepted the

15   Corps' proposition that the characterization of 1371(a)(3) was

16   an exception to the waiver of sovereign immunity.  We

17   absolutely unequivocally disagree with that position and do not

18   concede it.

19        The *Delaware Department of National Resources* case

20   was a case in which the federal judge ruled on summary judgment

21   after a full record.

22        The *Center for Biological Diversity* case, again, a

23   summary judgment case.

24        *In Re Missouri River System* was a 12(b)(6) case where

25   there was a record established.  Your Honor, you said at the

1   outset, in essence, where is the record?  There is to no record

2   upon which the Court could properly dismiss this as a facial

3   jurisdictional challenge under 12(b)(1).

4           The Government cites the North Dakota case.  That was

5   decided in the confines of a motion for a preliminary

6   injunction.  There was a robust record that had been set forth

7   in that case as part of the PI proceedings.  It's a very

8   different record than here.

9           In North Dakota, your Honor, there was a four-year

10  drought.  The Army Corps faced what they described as an

11  either/or proposition.  Either they follow the law of North

12  Dakota or they maintain the navigation channels.  In that case,

13  there were three different states who had -- which had

14  conflicting positions with regard to what the corps should do:

15  North Dakota, South Dakota, and Nebraska.

16          Those conflicting positions made the case in regard

17  to a preliminary injunction setting not appropriate to

18  continue.  There was implied conflict preemption.  The state

19  statute, as found by the federal district court judge,

20  frustrated federal law.  That is not the case here.

21          The only case that supports their proposition is the

22  *Wolf* case, which is cited in their briefs.  The *Wolf* case, the

23  Ninth Circuit case, involved a pro se plaintiff and

24  Rooker-Feldman abstention.  Very different than what we have

25  here.

1          Your Honor, the Court does not need to look beyond

2     two Ninth Circuit cases for its guidance.  *Safe Air*, a 2004

3     case, addresses the issue of the exceptional circumstances in

4     which a 12(b)(1) jurisdictional dismissal would be appropriate.

5     And the 2018 memorandum opinion of the Ninth Circuit in *Waste*

6     *Action*, follows *Safe Air*.  Where a -- where a jurisdiction is

7     inextricably intertwined with the merits, the parties must be

8     allowed to develop a record.

9          At minimum here, as the Court has already implied, I

10    believe twice, there are disputed facts.  Serious disputed

11    facts that I will get into with regard to the conclusory

12    allegations and statements of the Government about the treaty

13    and sovereign immunity.

14         There is no record in this case that would support a

15    jurisdictional dismissal.  At minimum, the parties should be

16    allowed to develop the facts.

17         Now, your Honor, the Government concedes that no

18    court has considered the interplay of Section 1365(a), which is

19    the Clean Water Act's waiver of sovereign immunity for suit

20    with Section 1371(a)(3), which is the particular provision

21    involving affect or impair a treaty.  There is no such case.

22    The Government is correct in that regard.

23         Therefore, it would be inappropriate under the

24    binding Ninth Circuit precedent under 12(b)(1) for the Court to

25    dismiss this case without allowing the parties to develop a

1   record.

2          The Government has submitted no affidavits, no

3   declarations, no testimony, no facts outside the treaty, the

4   minutes, to support its position that we should not have our

5   Congressionally mandated right to sue, to have our day in

6   court, and to have a court decide whether in fact there is

7   immunity from liability for the Government in this instance.

8          They have conflated immunity from suit from immunity

9   from liability --

10          THE COURT:  I think you have made that point.  And I

11   understand it, and I -- I would agree with it.  That's

12   the -- that's the legal position.

13          But, basically, what -- what fact -- or what -- what

14   essential fact do you feel would need to be addressed one way

15   or the other, developed one way or the other if -- if -- if the

16   12(b)(1) motion goes down?

17          MS. WARNER:  Your Honor --

18          THE COURT:  Isn't the central question whether the --

19   the claim would require the USIBWC to take action affirming or

20   impairing the 1944 treaty.  And we simply don't know that at

21   this point.  Isn't that your position?

22          MS. WARNER:  That is exactly our position, your

23   Honor.  The Government's reply is replete with overstatements

24   in that regard and with bald assertions.

25          Let me get into this area of what the Court is asking

1    with regard to what the factual developments should be.

2           First of all, the Government says this suit will,

3    quote, necessarily disrupt foreign policy conditions.  However,

4    they provide the Court with no specifics.  There are no

5    declarations.  There's no proof.  There's no statement with --

6    with regard to anything.

7           No. 2, the Government says, quote:

8           "The Clean Water Act, and the treaty conflict not

9           in purpose but in operation."

10          That's called an issue of fact.

11          No. 3, the Government says that the application of

12   the Clean Water Act would, quote, deprive, close quote, the

13   USIBWC of process, thereby affecting or impairing the ability

14   to negotiate with Mexico.  And counsel for the Government

15   stated that in his argument.

16          But there's no proof of that, your Honor.  There's

17   nothing in this record.  In fact, maybe it's exactly the

18   opposite.  Maybe the USIBWC could be aided by this litigation.

19   There's no record yet of the opposite.

20          The USIBWC hasn't accomplished anything concrete on

21   this critical human health issue since minute 283 in 1990.

22   Maybe the record would develop that this lawsuit helps and

23   assists with Mexico and their willingness to work on this

24   issue.  Let's find out.

25          We have the right, under the Clean Water Act, to sue,

1    to rective -- to develop that record.  It is an unequivocal

2    right that is under 1365(a).

3            Finally, your Honor, the Government says, quote,

4    There is an absence of factual dispute.  This is in their

5    reply.

6            The Government has in fact glossed over the

7    fundamental factual dispute about the effect of the Clean Water

8    Act compliance would have in impairing any treaty.  That's

9    precisely why dismissal at this stage is inappropriate.

10           Again, the Government has given no basis, no facts,

11   no law, no -- no foreign relations other than platitudes.  No

12   statement how the Clean Water Act and these treaty -- this

13   treaty and its minutes can be reconciled.

14           Now, the Government has gone to the length of

15   claiming that the -- the following proposition:  Section 371

16   provides sovereign immunity protection against Section 1365(a)

17   citizen suit provision.  That is not --

18           THE COURT:  You said 371.  Did you mean 1371?

19           MS. WARNER:  1371.  Excuse me, your Honor.  I'm

20   getting a little confused with either using the Clean Water Act

21   or the statute.

22           1371.  Okay.  That's not correct, your Honor.

23   There's no case that supports that proposition.  In fact,

24   1365(a), the citizen suit provision, authorizes suit without

25   limitation.  1371(a)(3) says nothing about sovereign immunity

1   or limiting the citizen suit provision waiver of sovereign

2   immunity.

3            The cases -- the cases interpret this part of 1371 to

4   require a conflict between the compliance with the Clean Water

5   Act and the section of 1371 at issue.

6            If the Government can in fact comply with the Clean

7   Water Act and fulfill the treaty, this so-called sovereign

8   immunity protection never is at play.

9            Your Honor, there's a case on this point.  There

10  hasn't been a lot of discussion yet about cases but cases are

11  important.

12           *Save Our Fisheries* is a case that directly addresses

13  the issue presented by the Government.  In that case, the Corps

14  of Engineers --

15           THE COURT:  That's a district case out of the

16  District of Rhode Island?

17           MS. WARNER:  That is correct, your Honor.  That is

18  correct.  That case --

19           THE COURT:  Well, it doesn't control.

20           MS. WARNER:  It does not control you.  It's

21  instructive.  We -- if I said control, I -- I -- forgive me.

22  It is instructive on the point.

23           In that case, the issue was whether the Corps of

24  Engineers could use the 1371(a) --

25           MR. COGHLAN:  (2).

1        MS. WARNER:  (2) -- thank you -- provision involving

2   navigation to, in essence, trump the citizen suit provision.

3        The Court said, in looking at the facts, that 1371

4   did not provide a broad exemption from the permitting

5   requirements under the Clean Water Act.  That in fact that

6   argument by the Government ran counter to congressional intent

7   and that a permit regarding the disposition of the spoils would

8   not affect or impair the ability of the Corps to maintain the

9   navigation channel.

10        THE COURT:  Now, that wasn't a treaty between

11   countries.  That was the ability of the Secretary of the Army

12   to basically maintain navigation.

13        MS. WARNER:  That is correct, your Honor.  And it's

14   the -- the reason why I cite it is because it is in fact the

15   only case.  As I said, there is not a case that is precisely on

16   point of what is presented to the Court.  However, the bigger

17   point here is the point that the Government tries to make in

18   its papers, which they're saying there's an either/or

19   proposition.  Either they comply with the Clean Water Act,

20   based upon the allegations we've made in our complaint, or they

21   comply with their treaty obligations under the 1944 treaty.

22        It is not an either/or proposition, in our view.

23   But, at minimum, it cannot be viewed as an either/or

24   proposition on this record.

25        Now, my final point, your Honor, going specifically

1    to the issues addressed by the Government and to one of your

2    questions.

3          The Government's position is basically the Surfrider

4    litigation and the IB litigation.  Forget about the RCRA.

5    Mr. Edling is going to address that.

6          The Surfrider litigation will impair or affect the

7    ability under this 1944 treaty and the minutes.  However, their

8    argument is belied by the very plain language of the treaty

9    itself in several of the minutes.

10         Article 20 of the treaty of 1944 states each

11   Government shall assume responsibility for and shall adjust

12   exclusively in accordance with its own laws all claims arising

13   within its territory in connection with the operation,

14   maintenance of the works agreed upon in the treaty or in future

15   minutes.

16         The treaty itself provides the answer here, at least

17   with regard to the dismissal.  Under the very words of the

18   treaty, the laws of the United States apply in the United

19   States to works that must be maintained pursuant to the treaty.

20         But there's more.  Article 23, page 41 of the treaty,

21   there is no jurisdiction of Mexico over the flood control

22   structure because it is in the United States.

23         Page 42, the operation and maintenance of the flood

24   control structure must be in accordance with U.S. law.  That's

25   what the article says.  Not specifically with regard to the

1    flood control structure but with regard to any works that are

2    made associated with the treaty.

3              Minute 26, September 24th, 1979, page 2:  Each

4    country, in dealing with its sanitation problems, has its own

5    quality standards.

6              Again, the Government's reply overstates the

7    proposition here.  There are clearly facts in dispute that

8    would preclude under the *Safe Air* case, at minimum, as binding

9    precedent on the Court, a 12(b)(1) jurisdictional dismissal --

10   dismissal.

11             And then, finally, as you picked up in the prior

12   argument, your Honor, the Government doesn't even attempt to

13   deal with this glaring contradiction.  The glaring

14   contradiction that setting -- putting the works together for

15   the canyon collectors and having NPDES permits associated with

16   them didn't affect or impair the 1944 treaty.

17             So what on this record is required is for Surfrider

18   and Imperial Beach to be allowed to present their case, develop

19   facts, develop discovery that proves that there is not an

20   impairment.

21             And on this record, the Government has presented no

22   law, no facts, no evidence that in any fashion what we are

23   suggesting and alleging with regard to the flood control

24   structure cannot be accomplished not only within proper

25   compliance with the Clean Water Act but within the proper

1    diplomacy with Mexico.  Why not try?  Nothing's been

2    accomplished since 1990.  Why not try?

3                Thank you.

4                THE COURT:  Thank you, Counsel.

5                Mr. Coghlan, I think I'll give you an opportunity to

6    respond --

7                MR. EDLING:  Your Honor?

8                THE COURT:  Yes.

9                MR. EDLING:  Sorry.  Can I -- I won't -- I don't want

10   to offer anything duplicative, and I won't.  Could I have 30

11   seconds just on the Clean Water Act?

12               THE COURT:  Yeah, I thought you were breaking up your

13   arguments, though?

14               MR. EDLING:  We were.  There was -- there was just

15   one point that I -- that I was hoping to make, your Honor, on

16   behalf of my client.

17               THE COURT:  Sure.  Why don't you step to the lectern.

18               MR. EDLING:  I won't belabor you.

19               THE COURT:  Yeah.

20               And then, Mr. Coghlan, I want to hear from you, to

21   button up this 12(b)(1) motion.  Okay?

22               MR. COGHLAN:  Yes, your Honor.

23               MR. EDLING:  And then after Mr. Coghlan, I'll just go

24   right to the RCRA claim, your Honor.

25               THE COURT:  Yes.

1          MR. EDLING:  Three points.  One --

2          THE COURT:  We've gone from 30 seconds to three

3     points now.

4          (Laughter.)

5          MR. EDLING:  I'm a lawyer, your Honor.  My timing is

6     always short.

7          THE COURT:  But we have a court reporter here, too.

8     You have to be mindful of her.

9          MR. EDLING:  Fair enough.  I think I'm down to ten

10    seconds now.

11         One, the 1944 treaty says that the Government must

12    comply with its own laws.  The Clean Water Act is a domestic

13    law.  There's no sunset treaty in the '44 -- there's no Sunset

14    Act in the '44 treaty.  That's point 1.

15         Two, we know that the United States can comply with

16    the Clean Water Act.  They have at this very facility.  So

17    there had to have been something about the flood control

18    conveyance that in and of itself would impinge their ability to

19    affect or impair the '44 treaty, which they haven't put forth.

20         And last -- and this is the point that I didn't catch

21    in Mr. Coghlan's argument.  The treaty governs what goes into

22    the conveyance.  The Clean Water Act, which is what this case

23    is about, is what exits the flood control conveyance.  If we're

24    wrong, we lose at summary judgment or trial.

25         But here, right now, the argument is that the United

1    States is violating the Clean Water Act with its discharge, in

2    violation of the Clean Water Act.  What exits the FCC, not what

3    enters it.  Even if we are right and we win, they still have

4    the ability to negotiate what enters the flood control

5    conveyance.

6              Those are the three points I wanted to make, your

7    Honor.

8              THE COURT:  Okay.  Thank you, Counsel.

9              Mr. Coghlan, I think that the primary argument made

10   by counsel essentially boils down to this.  That there may not

11   be substantial authority but there's some authority.  And, in

12   common, tools for gleaning legislative intent would seem to

13   establish the proposition that Section 1371(a) provides an

14   exception to 1323(a).  And that is the waiver of sovereign

15   immunity, not just a limit on the merits of the -- of the

16   claim.

17             And then the -- the language out of -- out of *Safe

18   Air For Everyone versus Meyer*, which is a Ninth Circuit case of

19   2004, getting back to the point, is -- is as follows:

20                  In a facial attack, the challenger asserts that

21                  the allegations contained in a complaint are

22                  insufficient on their face to invoke federal

23                  jurisdiction.  By contrast, in a factual attack,

24                  the challenger disputes the truth of the

25                  allegations that, by themselves, would otherwise

1          invoke federal jurisdiction.  A jurisdictional

2          finding of genuinely disputed facts is

3          inappropriate when the jurisdictional issue and

4          substantive issues are so intertwined that the

5          question of jurisdiction is dependent on the

6          resolution of the factual issues going to the

7          merits of the action.  The question of

8          jurisdiction and the merits of an action are

9          intertwined where a statute provides the basis for

10          both a subject matter jurisdiction of the federal

11          court and the plaintiff's substantive claim for

12          relief.

13      So this -- this appears to be more of a factual

14   attack in -- in reality than a facial attack, which would

15   trigger that language out of *Safe Air*.  Would you like to

16   address that?

17      MR. COGHLAN:  Your Honor, I don't agree with that

18   proposition here.

19      If you look at what *Safe Air* dealt with and what the

20   other case cited by Surfrider's counsel -- *Waste Action* --

21   dealt with.  It was a case where there was a -- an attack on

22   facts that went both to jurisdiction and to the elements of the

23   claim.

24      Now, here, for purposes this motion, we do not

25   dispute any of the elements of plaintiffs' claims.  We are

1   assuming, without conceding, that there has been a discharge of

2   pollutants from a point source into waters of the United

3   States.

4            Now, there's no factual dispute about what the

5   treaties say.  There's no factual dispute about what the Clean

6   Water Act requires by --

7            THE COURT:  But there could be a factual dispute --

8   very -- very possibly a factual dispute on whether or not

9   the -- the advancement of the -- of the action would -- would

10  impair the treaty.

11           MR. COGHLAN:  Well, I think, your Honor.

12           THE COURT:  Or affect the treaty?

13           MR. COGHLAN:  The question is, there's no dispute

14  that plaintiffs' construction of the Clean Water Act would

15  require USIBWC to assume legal responsibility for the quality

16  of water that passes through the flood control structure.

17           It is just what application of Clean Water Act to the

18  flood control structure would do.  The only question is, as a

19  matter of law, whether that open-ended legal responsibility

20  impairs or at the very least affects the ability of the United

21  States to exercise its rights under the treaty.

22           Those rights allow the United States Government to

23  seek a bi-national solution to a bi-national problem.  It

24  allows the United States Government to proceed through a

25  process of diplomatic negotiation informed by a careful

1   engineering study before agreeing to assume responsibility over

2   waste that's generated in Mexico and that flows across the

3   border.

4           The application of the Clean Water Act, under those

5   circumstances, would pre-figure the result of any negotiation.

6           THE COURT:  I know we're dealing with an area of

7   speculation here, but how -- how does -- how does Mexico have

8   an interest -- a direct interest in whether and to what extent

9   the United States, through -- through the commission is going

10  to treat these -- these flows once they enter the United

11  States --

12          MR. COGHLAN:  Well, your Honor.

13          THE COURT:  -- in terms of what active measures will

14  be taken?

15          MR. COGHLAN:  I think it's not what Mexico's

16  interests here are.  It's what the United States' rights --

17  negotiated rights under the treaty are.  And the United States

18  has a right to bring Mexico to the negotiation table and seek

19  commit -- commitments to address pollution that arises within

20  its borders.

21          Now, if the process of --

22          THE COURT:  And you're saying those rights are

23  somehow -- somehow challenged or compromised if this action

24  goes forward?  That -- that the negotiation posture of the

25  United States may be affected, given the existence of this

1  lawsuit?

2       MR. COGHLAN:  That's part of it, your Honor, but I

3  think it's stronger than that.  What we're saying is that the

4  result of any negotiation with Mexico is already predetermined

5  by the application of the Clean Water Act.

6       Now, the United States, going into that negotiation,

7  can -- can -- can potentially get from Mexico commitments to

8  address pollutants within its own borders.  But what the

9  application of the Clean Water Act adds to that diplomatic

10  solution is that the United States Government ultimately acts

11  as a guarantor of any actions that Mexico agrees to take.

12       The United States Government, if Mexico, say, fails

13  to undertake its treaty obligations and implement the

14  commitments it says it will to address pollution within its

15  borders, is left holding the bag for pollution that Mexico

16  fails to capture.  The commitment --

17       THE COURT:  Isn't the U.S. already doing that by --

18  by treating, secondarily, 25 million gallons of Mexican raw

19  sewage every day through the plant?

20       MR. COGHLAN:  Absolutely, your Honor.  But that's an

21  important point.  It's agreed to treat 25 million gallons a day

22  of sewage from Tijuana.  It hasn't agreed to assume an

23  open-ended legal responsibility for any waste that ends up in

24  Tijuana River.

25       The process that the United States went through, as I

1    alluded to before, to make that agreement to assume

2    responsibility for a finite quantity of Tijuana's waste was

3    thorough, it was involved.  It was foreign policy decision made

4    at the highest levels of both governments.  Here we're talking

5    about the application of a domestic law to impose on the United

6    States Government a potentially far broader obligation to treat

7    anything that ends up in Tijuana River.

8              THE COURT:  Okay.

9              MR. COGHLAN:  Your Honor, I would also just like to

10   address the argument that the treaty somehow pre-figures the

11   result of this case.  The treaty requires the United States to

12   abide by applicable provisions of domestic law.

13             No one disagrees that the Clean Water Act here cannot

14   be applied if it impairs or affects, for instance, the treaty.

15   To say that the United States is required to abide by the Clean

16   Water Act for actions that takes them to the treaty begs the

17   question of whether or not the Clean Water Act can be said to

18   apply in the first instance.  That's a question of law.  It's

19   not a question of fact.

20             And on that basis we believe that this motion is

21   properly decided under 12(b)(1).  Every court that's looked at

22   the applications of 1371 to the limited waiver of sovereign

23   immunity, the state law, has concluded that 1371 has some

24   bearing on that limited waiver.  There's no reason, that I can

25   see, that the limited waiver of sovereign immunity -- the suits

1    under the Clean Water Act wouldn't be similarly affected by

2    1371.  But if it is, if there is -- if there is a reason to

3    treat this differently, the analysis that the Court would have

4    to go through in deciding the United States' motion under a

5    12(b)(6) standard wouldn't differ at all than it would under a

6    12(b)(1) standard here.  *Safe Air For Everyone*, *Waste Action*,

7    those were cases where elemental facts were challenged on a

8    12(b)(1) standard.  The Court heard evidence of that

9    conflicting evidence at the pleading stages and decided the

10   case accordingly.

11            Here, we're not asking to introduce affidavits.

12   We're not asking to introduce, you know, scientific studies.

13   The treaty says what it says.  The Clean Water Act says what it

14   says.  And on that basis we argue that there is an impairment

15   or, at the very least, an effect on the provisions of 1944

16   treaty.  And on that basis, it's reasonable to resolve this

17   issue on a motion to dismiss.

18            THE COURT:  Thank you, Mr. Coghlan.

19            MR. COGHLAN:  Thank you, your Honor.

20            THE COURT:  Now let's get to the RCRA claim, the RCRA

21   motion.

22            Anybody want to argue that?

23            MR. EDLING:  I do.

24            (Laughter.)

25            THE COURT:  All right.

1           MR. COGHLAN:  Andy --

2           MR. EDLING:  Is there anything you want to add on

3   RCRA before I start?

4           MR. COUGHLIN:  Oh, I'm sorry, your Honor.

5           THE COURT:  Mr. Coghlan?

6           MR. COGHLAN:  On the RCRA claims, is there anything I

7   would like to add?  Well, if it's okay with your Honor, I could

8   let Mr. Edling present his argument and respond accordingly.

9           THE COURT:  Okay.

10          MR. EDLING:  Thank you.

11          Your Honor, in your order on the motion to dismiss,

12  you stated that the first amended complaint failed to include

13  allegations that IBWC actively handled or treated any

14  wastewater in the flood control conveyance.

15          You additionally held that the wastewater that is not

16  detained by the canyon collectors, like the wastewater that is

17  never detained in the flood control conveyance, would flow into

18  the Tijuana River valley and make its way to the Pacific Ocean,

19  regardless of the defendants' actions.  It's those two points

20  that I want to focus on right now.

21          The Ninth Circuit, in *Hines*, held that active

22  involvement -- disjunctive -- is handling the waste, storing

23  it, treating it, transporting it, and disposing of it, or there

24  is some degree of control.

25          We heard today -- and it's in the papers.  But your

1   Honor asked, well, let's talk about the berms.

2          The United States --

3          THE COURT:  Well, that's the new factual theory.

4          MR. EDLING:  Yeah.

5          THE COURT:  So, it didn't exist last time around.

6          MR. EDLING:  Right.

7          THE COURT:  And so that's what we're -- we're dealing

8   with now, and so we have to look at this anew.

9          MR. EDLING:  I agree, your Honor.

10         THE COURT:  And that has ramifications.

11         I know -- I know, you know, there's been a strong

12  argument that we can't -- the Court can't even get to that

13  because of the notice of intent issue.  We've -- we've already

14  heard that argument.  We don't need to -- we don't need to go

15  back there.  But these are all issues that have arisen since --

16  since the last round.

17         MR. EDLING:  Yes, your Honor.

18         THE COURT:  Okay.

19         MR. EDLING:  And the only point that I wanted to make

20  on the berm is slightly different than what we've been

21  discussing this morning.

22         THE COURT:  Yeah.

23         MR. EDLING:  Is that it, in and of itself, is

24  evidence of the act of control, leaving aside the allegations

25  of increased substantial endangerment because of the pooling.

1    But if the United States can go into the flood control

2    conveyance and divert water and create berms, that is

3    tantamount to control.  That was a point that was not in the

4    back and forth, at least that I picked up in between your Honor

5    and counsel.  So I wanted to make that point.

6              Additionally, in our opposition brief, at pages 18

7    through 21 -- and I'm not going to go through them.  We go

8    point by point the actions by the United States that -- and

9    Veolia:  Handle, storing, and transporting.

10             I'm focusing on the flood control conveyance with

11   respect to the berms specifically because the flood control

12   conveyance was designed to transport and dispose of -- of waste

13   to a given location that it otherwise would not have actually

14   gone to.

15             And under the *United States versus Western*

16   *Processing*, which is a Western District of Washington -- so

17   it's not controlling but it is instructive.  Where a

18   transporter selects the ultimate disposal site, the disposal

19   requirement is satisfied.  So here --

20             THE COURT:  Well, we addressed that issue the first

21   time around.

22             MR. EDLING:  Yes, but --

23             THE COURT:  Just the existence of the channel and the

24   fact that basically it created the new Tijuana River which

25   linked up with the old Tijuana River -- I mean, that -- that

1    factual theory is -- has already been explored.  You've gone

2    beyond that in the second amended complaint.

3                MR. EDLING:  Right.

4                THE COURT:  So why don't we focus on that.

5                MR. EDLING:  Well, that's -- sorry.  And, now, I'm

6    saying, the berm, in and of itself, is evidence of them

7    directing the control of and discharge of the contamination.

8    If they can redirect it, it's going somewhere else, though.

9                THE COURT:  Is that the factual theory, though, as

10   you've developed it in the second amended complaint, the berm

11   itself?  You seem to be saying, "Look, what's been done here is

12   the placement of the berm, which has the effect of the

13   pollution moving through this -- this drainage course," whether

14   it's the flood control channel or through the canyon

15   collectors.  It concentrates the -- the pathogens.  It

16   concentrates chemical components such that it changes the --

17   well, you seem to be alleging that it changes the quality and

18   character of the waste material.  Now, that's a different

19   factual theory.

20               MR. EDLING:  Yes, it is, your Honor.

21               THE COURT:  And it has nothing -- in my view, it has

22   nothing to do with whether the -- the -- the construction of a

23   berm, in and of itself, is sufficient to -- to collect or store

24   or have or constitute active involvement.

25               I think -- I think that's basically been -- been

 1    handled the first time around or addressed the first time

 2    around by the Court.

 3              MR. EDLING:   Okay.

 4              THE COURT:   Now you're alleging something different.

 5    You're basically alleging that the -- that these structures,

 6    themselves, somehow change the quality and character -- may

 7    change the quality and the character.

 8              If I can get back to paragraph 67 of the second

 9    amended complaint and some of the allegations around there,

10    I'll let you get there, if you want to get there.

11              MR. EDLING:   I'm there, your Honor.

12              THE COURT:   You're talking about temporary storage

13    and drainage basins and pollutants suspended and waters are

14    deposited creating a waste sediment and other material that

15    builds up over time.   Completely new factual theory.

16              MR. EDLING:   Yes, your Honor.

17              THE COURT:   Then you're giving some different

18    iterations of that.

19              And then you wrap up by saying -- and this is under

20    subdivision 3 of paragraph 67.

21              "Defendants transport that waste out of the

22              detention basins via bulldozer or other

23              equipment."

24              Now, this is related to the canyon collectors.

25              "And discharge, deposit, dump, spill, or otherwise

```
 1              place that waste elsewhere in the Tijuana River

 2              valley, such that it may enter the environment.

 3              MR. EDLING:  Yes.

 4              THE COURT:  Now, that seems to be speculative.

 5              I don't know whether your use of the term "may" is an

 6   indication that it's uncertain or that it is -- that the method

 7   by which it absolutely enters the environment, including the

 8   air and water -- "may" seems to be total -- is "may" surplusage

 9   there?  In other words, why even use that -- that word?

10              If you're arguing or if you're alleging that this is

11   in fact what happens, why -- why -- why just -- why not allege

12   such that it enters the environment and polluting the air and

13   water?

14              That would suggest that that -- that there's evidence

15   that can be developed that the after condition is much

16   different than the before condition in character and quality.

17   But the introduction of the term "may" makes that very

18   uncertain.

19              MR. EDLING:  Sure, your Honor.  Let me address it.

20              THE COURT:  Okay.

21              MR. EDLING:  One, there will be expert testimony, at

22   some point, that it in fact does enter the air and environment,

23   causing a substantial endangerment.

24              Two, the statute itself -- the -- the key word or a

25   word in the statute is that it "may" lead to an imminent and
```

1    substantial endangerment.

2             Happy to excise that word and conform these pleadings

3    to proof at a later date, which --

4             THE COURT:  Are you saying there's going to be expert

5    testimony comparing the before condition to the after

6    condition?

7             The before condition being before berms and

8    structures and the after condition being after?

9             MR. EDLING:  Yes.

10            THE COURT:  Okay.

11            MR. EDLING:  And, your Honor, I -- I don't want to

12   belabor the point that -- there is a different allegation in

13   here, and that is the imminent and substantial endangerment

14   that we're just discussing now.  The point I was making is

15   there were structures that were created by the United States

16   after we were last here that certainly we felt went to your

17   question of where are the allegations of active control as

18   it -- as it relates to transport or disposal.  That was the

19   point I was making on the berm.

20            THE COURT:  Okay.

21            MR. EDLING:  As it relates to the NOI, which I think

22   is --

23            THE COURT:  How does -- how does the *Hines* case help

24   you, other than providing a definition?

25            I mean, obviously, in *Hines*, you know, the Court

1   upheld the -- the dismissal of the action at the 12(b) stage

2   because the -- the activity of the manufacturers of the

3   cleaning equipment directly -- it was just too attenuated to be

4   in any way contributing to the disposal of waste by the dry

5   cleaners who were the defendants in that case.  And so that

6   case got blown out by -- by the Ninth Circuit.

7           How does that case help, other than just to cite some

8   general language in its holding at the end of the case?

9           MR. EDLING:  Well, I think it helps quite a bit.  The

10  reason that it helps is it states that handling the waste,

11  storing it, treating it, transporting it, and disposing it are

12  the active function.  There isn't -- there isn't something on

13  top of that.  And, as a disjunctive, to some degree of control.

14  So to the extent --

15          THE COURT:  Active -- some degree of active control?

16          MR. EDLING:  Yes.

17          So those actions in the disjunctive -- if you handle

18  it, if you store it, if you transport it, if you treat it, or

19  you exercise some degree of control, those equal the active

20  involvement.

21          So there was an example out of the Western District

22  of Washington where a factory farm -- I think it's cited in

23  both.  I know it's cited in our papers.  I believe it's cited

24  in the United States' papers as well.  Where the owner of a

25  factory farm -- all right -- allowed excessive amounts of

1   manure to come up on that factory farm.  And then the nitrates

2   got down into the soil and the groundwater.  And just by owning

3   the factory farm, that was evidence of a degree of control of

4   the problem.

5           Here we have beyond this control of the flood control

6   conveyance, we have the -- the conveyance, itself, is designed

7   to transport the waste.  That is the point of *Hines*, at least

8   from our perspective.

9           Now, with respect to, your Honor, I believe the last

10  point that was made by the defendants was the notice of intent,

11  and I didn't want to leave that unaddressed.

12          THE COURT:  Yes, please.  Please address that.

13          MR. EDLING:  The Ninth Circuit in *San Francisco Bay*

14  *Keeper v. Tosco*, which is the central foundation, is the

15  parties need to be on notice with reasonable specificity to

16  give the defendants a chance to fix a problem or to put them on

17  notice such that regulatory agencies could take notice of the

18  violations.

19          Well, that very thing happened here.  All right?  We

20  had the regional board filing suit.  We have the state lands

21  commission filing suit.  We have an instance where the central

22  allegations of the complaint have been consistent from the

23  beginning.

24          And one sort of logical extension of the defendants'

25  argument is let's say in this case we have discovery and new

1   matters and proof come in.  Is that going to require us, every

2   time, to serve a new notice of intent as it goes to the

3   underlying theories of liability which have remained unchanged?

4   That's not how the rules of civil procedure work, your Honor.

5           And with that, I'll sit.  Thank you, your Honor.

6           THE COURT:  Okay.  Thank you, Counsel.

7           You know, my earlier comment, Mr. Edling, if you'll

8   want to step back up there, conflated, I think, two different

9   things that the Ninth Circuit was talking about in *Hines*.

10          The Court did say that handling the waste -- storing

11  it, treating it, transporting it, and disposing of it -- are

12  all active functions with a direct connection to the waste

13  itself.  And then, later on, "contributing requires a more

14  active role with a more direct connection to the waste, such as

15  by handling it, storing it, treating it, transporting it, or

16  disposing of it."

17          I think the -- the Court could strike those broad

18  strokes in that case because, as I say, the -- the action of --

19  of the equipment manufacturers there was so attenuated from

20  anything the dry cleaners were doing.  They were -- they were

21  basically making equipment.  That's all they were doing.

22          MR. EDLING:  Yes, your Honor.

23          THE COURT:  And they were selling it.  And, beyond

24  that, they had nothing to do with it.

25          But, as I recall, they did have instruction manuals,

1    and the like.  Which, arguably, perhaps had some effect at the

2    time the waste was actually being disposed of by the -- by the

3    dry cleaners.

4                MR. EDLING:  Yes, your Honor.

5                THE COURT:  But the holding is -- at the last of

6    the -- the -- of the opinion:

7                     "We hold that to state a claim predicated on RCRA

8                     liability for, quote, contributing to, end quote,

9                     the disposal of the hazardous waste, a plaintiff

10                    must allege that the defendant had a measure of

11                    control over the waste at the time of its disposal

12                    or was otherwise actively involved in the waste

13                    disposal process.

14               So that's -- that's the holding in -- in broad terms,

15   and we're still looking at what constitutes disposal --

16               MR. EDLING:  Your Honor, at that same --

17               THE COURT:  -- contribution --

18               MR. EDLING:  I apologize.

19               THE COURT:  Yeah.  Go ahead, please, Mr. Edling.

20               MR. EDLING:  In that same opinion, the Ninth Circuit

21   defined "actively involved" at pin cite 852 as handling the

22   waste, comma, storing it, comma, treating it, comma --

23               THE COURT:  Yeah, I read that.  I read that.

24               MR. EDLING:  So that's the definition of actively

25   involved.

1          So if the plaintiff alleges that the defendant was

2    otherwise actively involved in the disposal process, that is

3    sufficient at the 12(b)(6) stage.

4          Here is just one example of those elements.  The

5    flood control conveyance is the ultimate source that discharges

6    the contamination.  It identifies where it will be disposed.

7          And in the disjunctive, we have -- we have both.  If

8    there is some degree of control -- meaning you have no active

9    involvement.  And this is the -- the example from the -- the

10   factory farm, where the owners are not actually there but they

11   have some control in the sense of the hiring and the firing --

12   you can also be held liable.

13         Here, we know that there's active control by the very

14   actions that are being taken in the flood control conveyance.

15   For example, the berm.  That was my -- that was the point I was

16   trying to make.  That to satisfy *Hines*, it is a disjunctive

17   test, and the United States flunks both.

18         THE COURT:  Okay.  Thank you.

19         Mr. Coghlan.

20         MR. COGHLAN:  Your Honor, the first point I'll make

21   is that plaintiffs, again, plead the same theory of liability

22   they pled previously in their earlier RCRA claim with a new

23   twist that's nowhere addressed in their NOI.

24         They conflate control over the flood control

25   structure and canyon collectors with control over waste that

1  flows through those flood control structures through no

2  substantial action of USIBWC.

3          The Ninth Circuit recognized a theory of some measure

4  of control over waste at the time of the disposal, but they

5  specifically said that there was some substantial affirmative

6  action necessary along with that element of control.  And they

7  just haven't alleged that, again, here, when they talk about

8  the pure existence of the flood control structure and canyon

9  collectors.

10          The other point I'll make is that counsel --

11          THE COURT:  Isn't -- isn't your better argument that

12  if they're -- they're a contributor in -- in the sense that

13  they're handling it or they're storing it or they're somehow,

14  you know, maintaining some physical control over it -- and I

15  keep going back to the canyon collectors because that seems to

16  be, you know, the -- the most involved and active measure

17  that's been taken by the Government.

18          So, yes, they're -- they're technically meeting the

19  requirement but there's no causation.  There's no causation

20  of -- of injury to the environment.

21          Now, whether there is or not, it would obviously

22  involve development of an evidentiary record if -- if that's

23  the way, you know, the decision goes here.

24          But I think -- I think that the statute and the --

25  and the -- and the cases contemplate -- contemplate

1    contribution and causation or -- or contribution embraces a --

2    an element of causation.

3              MR. COGHLAN:  That's absolutely true, your Honor.

4    Every court that's examined the issue --

5              THE COURT:  So we're quibbling over -- not quibbling.

6    But, you know, we're really focused on whether -- whether

7    containing this -- these -- these polluted waters in a -- in --

8    in -- in a collector is handling the -- the pollution or

9    storing it.  And you can see the arguments that would logically

10   support that.  And we seem to be spending a lot of time on

11   that.  Whereas ultimately the -- you know, the -- the analysis

12   may be whether or not any -- any additional harm has been

13   caused to the public or the -- or the environment; any imminent

14   harm by virtue of what's being done here.

15             So, anyway, I -- it was a thought.

16             MR. COGHLAN:  I think that's correct, your Honor.

17   And there is a fatal lack of causation in their theory that the

18   flood control structure and the canyon collectors, by virtue of

19   their existence, somehow lead to an imminent and substantial

20   endangerment to human health and the environment.  I mean,

21   we're dealing with waste that has flowed for many decades from

22   Tijuana into San Diego region and would continue to do so if

23   the canyon collectors --

24             THE COURT:  You don't think there are any allegations

25   of causation of increased harm set forth in the -- in the

1    second amended complaint?

2              MR. COGHLAN:  The only allegations of causation of

3    increased harm set forward in the second amended complaint

4    concern factual theories that Plaintiffs' counsel has just said

5    about three times are new as of the second amended complaint.

6              We had no notice that the creation of berms would

7    somehow create an imminent and substantial endangerment.

8    That's not just a pleading I see.  That's a jurisdictional

9    requirement.

10             THE COURT:  Well, you just referred to it, as -- as

11   you stood up, as a new twist.

12             MR. COGHLAN:  Yeah.  Yeah, exactly.  That's my point,

13   your Honor.

14             THE COURT:  A twist.

15             MR. COGHLAN:  Yeah.

16             THE COURT:  Okay.

17             MR. COGHLAN:  Oh, I see what you're saying.  No,

18   that --

19             THE COURT:  That does seem to diminish the

20   significance of the threshold argument related to the NOI --

21             MR. COGHLAN:  A poorly chosen word on my part, your

22   Honor.

23             THE COURT:  Okay.

24             MR. COGHLAN:  Let me just go back to what the

25   requirements are for notice.  You have to give the plaintiff an

1  idea of exactly the action it's taken that's led to the

2  imminent substantial --

3           THE COURT:  I understand that.

4           MR. COGHLAN:  That's in the regs.  That's Ninth

5  Circuit law.  And they just haven't done that here.  If the

6  creation of a berm harms, somehow, plaintiffs, then their NOI,

7  as drafted, could not have been drafted better to obscure that

8  point if they had set out to do so intentionally.

9           This is a jurisdictional requirement.  It's not

10  something to be cast aside.  And if there's a failure of

11  notice, then that's it.  That claim fails as a matter of law.

12           THE COURT:  Okay.  Did Veolia wish to be heard on

13  this one?

14           MR. BIENERT: just one last point.

15           THE COURT:  Okay.

16           MR. BIENERT:  It's what he just finished with, your

17  Honor.

18           THE COURT:  Thank you, Mr. Edling [sic].

19           MR. BIENERT:  We've talked about what the standard is

20  jurisdictionally for notice.  But I at least wanted to

21  highlight, as the Supreme Court's -- lays out the reason for

22  the standard.  And it's, one, to allow -- the reason you need

23  to give notice before you can sue is, one, to allow

24  governmental agencies who receive notice to take responsibility

25  for enforcing environmental regulations, thus obviating the

1    need for citizen suits.  And, in particular -- two -- and give

2    the alleged violator, quote, an opportunity to bring itself

3    into complete compliance with the act and, thus, likewise

4    render unnecessary a citizen suit, unquote.

5            If the plaintiffs really do not want us to have berms

6    that are somehow adding to pollution, in their theory, I have

7    to admit while, obviously, I want to get notice, I think the

8    parties should be talking about ways to address that.  But I

9    think it's about as easy a fix as there is.  Because unlike,

10   you know, some of the other structures that are immute and

11   nonchangeable, the berm issue -- even as alleged by the

12   plaintiffs -- is something where Veolia is taking active

13   action -- a guy in a Bobcat -- to try to create a little

14   trough; to get more of the sewage into the grates.  All he has

15   to do is not do that and that whole issue goes away.

16           And, you know, every now and then there's the "Let's

17   not a make federal case about something if we don't have to."

18   We should not here be litigating for what could be years

19   whether or not they should quit doing berms if that's really

20   their issue.

21           Now, what concerns me the most, your Honor, is we

22   can't ignore what was said in the original complaint -- which,

23   really, was not that issue.  It was the opposite:  You're not

24   doing enough.  We can't ignore what's in the NOI, which is

25   consistent with what's in the original complaint:  You're not

1   capturing enough.  Has nothing to do with berms or efforts made

2   to capture more.

3           Even now, your Honor, they still have in the

4   complaint -- I was looking for the paragraph.  I forget which

5   one it is.  But one of the affirmative violations that they're

6   saying that Veolia committed is not putting sandbags at the

7   conveyance areas of the collection canyons -- canyon

8   collections to try to contain more of the fluid.

9           Well, I will tell you right now, first of all, I

10  don't think we have an obligation to do that.  But let's assume

11  we did take it -- them up on that.

12          If these earthen berms done by a Bobcat are somehow

13  allowing a few inches of sediment to sit in the sun and create

14  whatever the potential speculative chemical change is, I have

15  got a feeling that the sandbag method would do the same thing.

16          So I would submit to your Honor that not only do we

17  have a jurisdictional requirement that is required by law but

18  this is the ultimate case where the practical realities of what

19  we're dealing with show why it should have been met.

20          They're speaking out of both sides of their mouth

21  where, on the one hand, part of their allegations -- in fact,

22  all of their allegations are, Veolia, do more with the system

23  you have to help get rid of more pollution.  But now -- and

24  only after your Honor's original opinion dismissing the RCRA

25  claim -- have they come out with this new theory that is polar

1    opposite to the old theory:  Well, it looks like you're trying

2    to do something to correct and get a little more of the

3    effluvient into your system.  But now we're going to use that

4    as the basis to say we have RCRA jurisdiction.

5              I would submit, your Honor, that one can't help but

6    note that that's a straw-man argument or at least a speculative

7    argument that runs counter to what it said in the past that it

8    wants, that is only being put there as a thread to try and get

9    jurisdiction.  And I agree with what counsel said.  I think her

10   first sentence, "Rules matter," you must enforce rules.  You're

11   the gatekeeper on whether or not we even go forward with the

12   canyon collector side of the RCRA argument.  And they have not

13   met the standard for it, and it's right there in

14   black-and-white.

15             So on that basis, your Honor --

16             THE COURT:  And they would say, look, this is a

17   continuing harm; and, therefore, we could file a new notice of

18   intent at any time or an amended notice of intent.  What would

19   be your response to that?

20             MR. BIENERT:  I will call my client and say, "Quit

21   making berms."

22             THE COURT:  Okay.

23             MR. BIENERT:  We're done.

24             And, you know, what's interesting is -- I don't know

25   that this is factually true.  There is no basis for it.  But

1    their allegation is that we only started doing this after the

2    complaint.

3              So whatever we're talking about here, your Honor --

4    if we take at face value what they say -- they filed a

5    complaint that said, "You're not doing enough."  Somewhere

6    between when they filed it a year ago and today, we went out

7    and said, "Hey, guys.  Let's do a little more.  Let's get a

8    Bobcat out there and see if we can direct more of the

9    nonrain-event flow into the system."

10             And now they're going, "Ah-ha.  Now you violated."

11             Whatever we're talking about, if we take it at face

12   value, it's been only very recently instituted.  If that's what

13   they truly want and if the parties talk through the NOI process

14   that's really what they want, it can certainly -- with the

15   stroke of an e-mail -- be eradicated and done.  And then your

16   Honor and all of us can spend the time on the big issues that

17   are left in the case.  Not this -- I guess what we would

18   call -- anywhere from a few-week to a few-month foray to

19   address their concerns that they would rather not us do.

20             Thank you, your Honor.

21             MR. EDLING:  Your Honor, may I have one last word on

22   that?

23             THE COURT:  Yeah, I'll give you that.  But I -- I

24   would like to ask a question of you, Mr. Edling.

25             MR. EDLING:  Sure.

1          THE COURT:  You know, there's been a lot of -- a lot

2    of references to berms and features, and I know that it's the

3    position of the -- of I.B. that there are berms out at the

4    canyon collectors.  And I also know that there is alleged to be

5    a berm that's been constructed with respect to the flood

6    control channel.

7          MR. EDLING:  Yes.

8          THE COURT:  As I went through the complaint, it's a

9    little unclear to me as to whether the flood control channel

10   berms are the side slopes to the -- to the channel that were

11   built up relatively recent -- recently or the treatment of the

12   floor of the channel -- the earthen floor of the channel, where

13   it was basically, you know, corrugated and dredged and -- so as

14   to create an impediment to the flow of polluted waters entering

15   the United States, or both for that matter.

16          So what -- what for the berms --

17          MR. EDLING:  The former, your Honor.

18          THE COURT:  The former?  The side slopes?

19          MR. EDLING:  Yes.

20          THE COURT:  Okay.

21          MR. EDLING:  And the defendants both -- they cannot

22   have it both ways.  They're accusing us of talking out of both

23   sides of our mouth.  But in their papers, they're saying this

24   whole problem that's been occurring for the better part of 30

25   years is because of gravity and we have nothing to do with it.

1   Well, I have heard just, quote, active involvement with

2   bulldozers.  Okay?  That is not passivity.  That is not

3   gravity.  That is a directional decision made by the defendants

4   to work within the canyon collectors and the flood control

5   conveyance.  Okay?

6         You cannot say, "We don't have anything to do with

7   the problem and we're not actively involved," if we're building

8   things in the conveyance and we're sending out bulldozers.

9         And *Hines* is the case for that.  We're not here,

10  saying, "Don't fix the problem."  What we're saying is, "You

11  have the ability to fix the problem.  You make berms.  You have

12  bulldozers out there.  It happens to be that you're making the

13  problem worse and we would like you to fix it."

14        But it is certainly -- it is the antithesis of we

15  have nothing to do with this problem.  They have the ability to

16  fix it.  And under the Ninth Circuit law, they satisfy the RCRA

17  standard that you found lacking in the first amended complaint

18  by these very actions.

19        Thank you.

20        THE COURT:  Thank you.

21        All right.  These motions are taken under submission

22  at this time.

23        Counsel, thank you for your arguments and the quality

24  of the papers.  We'll get out a written order on it.

25        MR. EDLING:  Thank you very much, your Honor.

74

1          MS. WARNER:   Thank you, your Honor.

2          (Conclusion of proceedings.)

3

4

5                          --oOo--

6

7   I certify, by signing below, that the foregoing is a correct

8   stenographic transcript of the oral proceedings had in the

9   above-entitled matter this 19th day of December, 2018.   A

10  transcript without an original signature or conformed signature

11  is not certified.   I further certify that the transcript fees

12  and format comply with those prescribed by the Court and the

13  Judicial Conference of the United States.

14          /S/ Amanda M. LeGore

15          _____

16          AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

17

18

19

20

21

22

23

24

25